292 U.S. 1 (1934)
FLORIDA ET AL.
v.
UNITED STATES ET AL.
No. 342.
Supreme Court of United States.
Argued February 13, 1934.
Decided April 2, 1934.
APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF GEORGIA.
*2 Messrs. Theodore T. Turnbull, Henry P. Adair, and J.V. Norman, with whom Mr. Cary D. Landis, Attorney General of Florida, and Messrs. C.G. Ashby, August G. Gutheim, and F.C. Hillyer were on the brief, for appellants.
Mr. J. Stanley Payne, with whom Solicitor General Biggs and Messrs. Elmer B. Collins, Harold M. Stephens, and Daniel W. Knowlton were on the brief, for the United States and Interstate Commerce Commission, appellees.
Mr. Robert C. Alston, with whom Messrs. Carl H. Davis, W.E. Kay, Wm. Hart Sibley, and Alfred P. Thom were on the briefs, for the Atlantic Coast Line R. Co., appellee.
MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.
This appeal presents the question of the validity of an order made by the Interstate Commerce Commission on July 5, 1932, requiring the Atlantic Coast Line Railroad Company to desist from an unjust discrimination *3 found to exist in the relation of intrastate and interstate rates and to maintain certain rates for the intrastate transportation of logs, as described, within and throughout the State of Florida for distances of 170 miles or less. 186 I.C.C. 157; 190 I.C.C. 588. The order was sustained by the District Court, three judges sitting. 4 F. Supp. 477.
By an order of August 2, 1928, the Commission prescribed interstate rates on logs on the lines of the Atlantic Coast Line Railroad Company from points in northern Florida to destinations in Georgia for distances not exceeding 170 miles. Finding that the Florida intrastate rates on similar logs for similar hauls, generally described as the Cummer scale, resulted in unjust discrimination, the Commission also established rates for intrastate application within Florida which would correspond with the rates fixed for interstate transportation. 146 I.C.C. 717. The order in the latter respect was assailed and the decree of the District Court sustaining it was reversed by this Court. Florida v. United States, 282 U.S. 194. We decided that the order could not be upheld on the ground of undue prejudice against persons and localities in interstate commerce, and that it could not be sustained on the ground of unjust discrimination against interstate commerce from the standpoint of revenue losses due to intrastate rates as the order in that aspect was not supported by appropriate findings.
Meanwhile, in February, 1929, both the interstate rates and intrastate rates, as prescribed, had been put into effect. After the mandate of this Court, the Cummer scale of intrastate rates was restored and became effective on April 10, 1931. The Interstate Commerce Commission reopened the proceedings and, after hearing, found that the Cummer scale of intrastate rates caused unjust discrimination against interstate commerce from a revenue standpoint. The Commission made no finding with respect to under prejudice against persons and localities *4 in interstate commerce. The Commission accordingly entered the order of July 5, 1932, now under review. While bills were pending in the District Court to enjoin this order, the Commission granted a further hearing in view of the representation that a number of southern railroads had reduced their log rates, and on January 9, 1933, the Commission made an additional report which affirmed the findings previously made and restored the order of July 5, 1932, to be effective February 25, 1933. 190 I.C.C. p. 600. Supplemental bills were filed in the District Court, and on February 24, 1933, the decree was entered upholding the Commission's action.
The order of the Commission is attacked upon the grounds (1) that under Emergency Railroad Transportation Act, 1933 (c. 91, 48 Stat. 211), the Commission was without power to make the order; (2) that the findings of the Commission are inadequate to sustain the order; and (3) that if the findings can be deemed to be adequate, they are not supported by the evidence.
First. The power of the Commission. By Transportation Act, 1920 (41 Stat. 484), the Congress granted specific authority to the Commission to remove discriminations against interstate commerce caused by intrastate rates. The Congress amended § 13 of the Act to Regulate Commerce so as to empower the Commission to confer with state authorities "with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the Commission." § 13 (3). And, whenever in the course of its authorized investigations, the Commission, after full hearing, finds that any rate, regulation, or practice "made or imposed by authority of any State" causes "any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination *5 against interstate or foreign commerce," the Commission is required to prescribe the rate thereafter to be charged, or the regulation or practice thereafter to be observed, in such manner as in its judgment will remove the discrimination. The order of the Commission is to bind the carriers, parties to the proceeding, "the law of any State or the decision or order of any State authority to the contrary notwithstanding." § 13 (4).
In Railroad Commission of Wisconsin v. Chicago, B.Q.R. Co., 257 U.S. 563, 585-587, we reached the conclusion that the provision of § 13 (4) for the removal of "any undue, unreasonable, or unjust discrimination against interstate commerce" was not to be regarded as referring only to discrimination as between persons and localities. We held that Transportation Act, 1920, imposed an affirmative duty on the Commission "to fix rates and to take other important steps to maintain an adequate railway service for the people of the United States." Intrastate rates, we said, must play a most important part in maintaining such an adequate system. If there was interference with the achievement of that purpose because of a disparity of intrastate rates as compared with interstate rates, the Commission was authorized to end that disparity. It was to be ended because it constituted an "unjust discrimination against interstate commerce" We concluded that these words in § 13 (4) were not tautological, but had the necessary effect of conferring authority upon the Commission to raise intrastate rates so that the intrastate traffic may produce its fair share of the earnings required to meet maintenance and operating costs and to yield a fair return on the value of property devoted to the transportation service, both interstate and intrastate. United States v. Louisiana, 290 U.S. 70, 75.
Appellants insist that this result was reached because of what was described as the "dovetail relation" between *6 § 13 (4) and § 15a, and that the amendment of the latter section by Emergency Railroad Transportation Act, 1933, has effected a radical change. They contend that the Commission no longer has authority to remove an unjust discrimination against interstate commerce caused by a disparity of intrastate rates viewed from a revenue standpoint. We are unable to accept that view. Section 13 (4) was not amended by Emergency Railroad Transportation Act, 1933. The authority conferred by § 13 (4) to prescribe intrastate rates for the purpose of removing an unjust discrimination against interstate commerce was not withdrawn. The Congress had knowledge of the construction given to § 13 (4) by this Court and of the important effect of that construction in relation to intrastate rates found to be inadequate. The conclusion is not lightly to be reached that the Congress would have undertaken to change a policy of such great importance without explicit language indicating that purpose.
The purpose of the changes in § 15a is not left in doubt. They were made with the manifest object of eliminating the provisions for the recapture of excess income of carriers and of revising the rule as to rate making.[1] The requirement imposed by Transportation Act, 1920, for the adjustment of rates according to rate groups was abolished and in substitution the Commission was directed to give due consideration to the factors which are specified in the section as amended.[2] Thus the Commission is to consider. *7 among other factors, "the effect of rates on the movement of traffic"; "the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service"; and "the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management, to provide such service."[3]
Neither the elimination of the group method of rate making, not the substituted rule, suggests an intention to impair the Commissioner's authority over intrastate rates for the appropriate protection of interstate commerce. On the contrary, the substituted rule of rate making by *8 its express terms emphasizes the carriers' need of adequate revenues. The Congress had provided authority to meet that need where inadequate intrastate rates caused unjust discrimination against interstate commerce. The Commission had exercised that authority. The Commission had not proposed the diminution of that authority. The new Act discloses no intention to weaken national control for essential national purposes over the railway system of the country. It was rather designed to aid that control in the light of the depressed economic condition of the railways. We conclude that the new rule of rate making left the power of the Commission under § 13 (4) intact.
Second. The Commission's findings. On the former appeal we pointed out that if the action of the Commission was not simply for the removal of undue prejudice against interstate commerce as between persons or localities, and the Commission undertook to prescribe a statewide level of intrastate rates in order to avoid an undue burden, from a revenue standpoint, upon the interstate carrier, there should be appropriate findings upon evidence to support an order directed to that end. We observed that in dealing with unjust discrimination as between persons and localities the question was one of the relation of rates to each other; but that in considering the authority of the Commission to enter the state field and to change a scale of intrastate rates in the interest of the carrier's revenue, the question was that of the relation of rates to income. But to support the order than under review, the Commission had made no findings as to the revenue which had been derived by the carrier from the traffic in question, or which could reasonably be expected under the increased rates, or that the alteration of the intrastate rates would produce, or was likely to produce, additional income necessary to prevent an undue burden upon the carrier's interstate revenues and to maintain an *9 adequate transportation service. Florida v. United States, supra, pp. 212, 214, 215.
On the new hearing, the Commission made comprehensive findings to supply what had thus been found to be lacking. The findings set forth at length transportation conditions, traffic and revenues. 186 I.C.C. pp. 160-189. Appellants' criticisms proceed upon an unwarranted assumption. The requirement of essential findings as to revenues did not demand and impracticable exactness. Losses through inadequate rates could be shown satisfactorily even though proof of the precise extent of such losses was not available. Reasonable determinations were required and these were made.
Reviewing the history of the Cummer scale of intrastate rates on logs, and considering comparable interstate and intrastate rates, the Commission found that the Cummer scale was abnormally low and less than reasonably compensatory; that the defendants' revenue under the Cummer scale was "insufficient under all the circumstances and conditions to cover the full cost of the service." Id., pp. 165, 187. The Commission was able to go further. In considering the effect of the Cummer scale upon interstate commerce, the Commission was aided by evidence of actual operations during the period from February 8, 1929, to January 31, 1931, when the increased intrastate rates prescribed by the former order were in effect. The Commission, in its summary, found (id., pp. 188, 189):
"The record shows that during the period of approximately two years following the increase in the rates the total movement amounted to 18,602 cars. This total included 3,740 cars transported to Eastport, Lacoochee and Otter Creek in trainload movements that have ceased and will not be resumed. Under normal economic conditions it seems probable that the annual volume of the Florida log movement under rates the same as those previously *10 prescribed will not be less than the average of this 2-year period minus the number of cars included in the discontinued trainload movements. This average is 7,431 cars. That the movement will not be less than this under normal conditions is confirmed by the fact during the five months immediately preceding the last hearing in this case, February to June, 1931, when conditions were abnormal, there were shipped over defendant's lines in Florida a total of 2,765 cars of logs. This movement was at the rate of 6,636 cars a year. We believe that the movement of logs intrastate in Florida over defendant's lines will not be materially curtailed under the rates which we here prescribe, which are the same or substantially the same as the rates generally in effect and under which logs freely move throughout the South.
"The freight charges collected on the 18,602 cars above referred to aggregate $571,508.94, and if the Cummer scale had applied the charges would have been $281,225.75. The freight charges collected on the 3,740 cars referred to were $100,439.06, and if the Cummer scale had applied they would have been $48,286.75. On the 14,862 cars remaining after deducting the 3,740 cars from the total movement of 18,602, the freight charges collected were $471,069.88 ($571,508.94 minus $100,439.06) and if the Cummer scale had been applicable they would have been $232,939 ($281,225.75 minus $48,286.75) or $238,130.88 less than those actually collected. Accordingly, on the basis of an average of 7,431 cars a year under normal economic conditions, which basis we believe conservative, the gross revenues under the rates prescribed by the previous order herein would be more than $100,000 a year greater than under the Cummer scale, now in effect. The application of the Cummer scale, therefore, places a substantial burden upon defendant's interstate revenues. If the revenues yielded by the Cummer scale are not sufficient to cover the cost of the service, as the cost evidence *11 indicates, it would follow that part of the above-stated amount would constitute a dead loss in net revenue.
"We find that the circumstances and conditions surrounding the transportation of these logs interstate in Florida are not on the whole as favorable as the circumstances and conditions surrounding the interstate movement of logs over defendant's lines. . . .
"We further find that the intrastate rates on logs over 6 feet in length, except walnut, cherry, and cedar, applicable between points on the Atlantic Coast Line in Florida for distances of 170 miles and less are, and for the future will be, unjustly discriminatory against interstate commerce, and that such unjust discrimination can be and should be removed by the establishment between all points on the Atlantic Coast Line in Florida for distances of 170 miles or less of rates not less than the rates shown for such distances in Appendix F hereto, which are the rates found reasonable for interstate application from northern Florida to Georgia."
On the second rehearing, with respect to change made by southern rail carriers in their log rates  which appeared to have been made largely for the purpose of meeting truck competition  the Commission found that in Florida the movement of logs had "not been shown to have gone to the trucks to any substantial extent where the hauls are over 25 miles"; that "truck-competitive rates for distances under 25 miles would regain little, if any, traffic"; and that the maintenance of the Cummer scale to meet what little truck competition could be met in that way would greatly decrease the revenues of the Atlantic Coast Line Railroad Company and would not be warranted. 190 I.C.C. p. 599.
We perceive no ground for the connection that the Commission has failed to make the basic findings necessary to support its ultimate conclusion.
*12 Third. The evidence before the Commission. The question of the weight of the evidence was for the Commission and not for the court. The authority conferred upon the Commission by § 13 (4) of the Interstate Commerce Act, with respect to intrastate rates, is not different in its quality or effect from that given to the Commission to prevent other sorts of unjust discrimination against interstate commerce. That authority rests upon the constitutional power of the Congress, extending to interstate carriers as instrument of interstate commerce, to require that these agencies shall not be used in such manner as to cripple, retard, or destroy that commerce, and to provide for the execution of that power through a subordinate body. Shreveport Case, 234 U.S. 342, 351, 354, 355; Railroad Commission of Wisconsin v. Chicago, B. & Q.R. Co., supra. The purpose for which the Commission was created was to bring into existence a body which, from its special character, would be best fitted to determine, among other things, whether upon the facts in a given case there is an unjust discrimination against interstate commerce. United State v. Louisville & Nashville R. Co., 235 U.S. 314, 320. That purpose unquestionably extended to the prohibited discrimination produced by intrastate rates. In relation to such a discrimination, as in other matters, when the Commission exercise its authority upon due hearing, as prescribed, and without error in the application of rules of law, its findings of fact supported by substantial evidence are not subject to review. It is not the province of the courts to substitute their judgment for that of the Commission. Interstate Commerce Comm'n v. Louisville & Nashville R. Co., 227 U.S. 88, 100; Western Chemical Co. v. United States, 271 U.S. 268, 271; Virginian. Railway Co. v. United States, 272 U.S. 658, 663; Assigned Car Cases, 274 U.S. 564, 580; Merchants Warehouse Co. v. United States, 283 U.S. 501, 508; Crowell v. Benson, 285 U.S. 22, 50, 51.
*13 We agree with the conclusion of the District Court that there was no lack of substantial evidence to support the Commission's findings.
The Commission's determinations were "without prejudice to the right of the authorities of the State of Florida or of any other interested party to apply in the proper manner for a modification of its (our) findings and order as to any specified intrastate rate on the ground that it is not related to interstate rates in such a way as to contravene the provisions of the Interstate Commerce Act." 190 I.C.C. p. 600.
Decree affirmed.
NOTES
[1] See report of the Committee on Interstate and Foreign Commerce of the House of Representatives, H.R. No. 193, 73d Cong., 1st sess., pp. 28-30.
[2] Section 15a in its amended form is as follows:

"Section 15a. (1) When used in this section, the term `rates' means rates, fares, and charges, and all classifications, regulations, and practices relating thereto.
"(2) In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management, to provide such service."
[3] As to the substituted rule of rate making, the House Committee said in its report: "The rule of rate making as rewritten in the proposed paragraph (2), found in section 205 of the bill, directed the Commission to give due consideration, among other factors, to the effect of rates on the movement of traffic; to the, need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, Under honest, economical, and efficient management, to provide such service. It is difficult to conceive of a reasonable rate which would ignore any one of these considerations. The Commission as a fair and impartial body acting for the Congress will continue to give consideration to these factors. In the case of the power given to the Commission to prescribe just and reasonable rates the committee does not believe that it is necessary to encumber the statutes with further language which might be mandatory in terms, but which could add nothing further to the plain duty of the Commission under the law, and which might be interpreted to imply a distrust of the Commission in prescribing just and reasonable rates. The Commission will and must give consideration to all facts developed on the record and see to it that the record is enlightening as to such factors as are mentioned in the first section of this bill." H.R. No. 193, 73d Cong., 1st sess., p. 30.