## BALTIMORE & O. R. CO. et al. v. UNITED STATES.

District Court, N. D. New York.

Dec. 27, 1937.

534

Edward A. Kaier, of Chicago, Ill., and Edw. H. Burgess, of New York City, for plaintiffs.

J. Stanley Payne, of Washington, D. C., for Interstate Commerce Commission.

Elmer B. Collins, of Washington, D. C., for the United States.

Wayne W. Wolford, of Washington, D. C., for New Orleans Joint Traffic Bureau.

Laurence F. Daspit, of New Orleans, La., for Henderson Sugar Refinery.

C. R. Hillyer, of Chicago, Ill., for Savannah Sugar Refining Corporation.

John F. Finerty, of Washington, D. C., for National Sugar Refining Co. of New Jersey.

Edgar Watkins, of Atlanta, Ga., for the States of Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee.

Before L. HAND, Circuit Judge, and COOPER and COXE, District Judges.

L. HAND, Circuit Judge.

This cause comes up for trial upon petition and answer in a suit to set aside three orders of the Interstate Commerce Commission, suspending certain rates filed with the Commission by the plaintiff carriers, and ordering lower maximum rates to be put into effect. It will clarify the discussion to define in advance several of the terms to be used. "Official Territory" means that lying north of the Ohio and east of the Mississippi, with a little of Kentucky and West Virginia; that part of this territory lying east of a line drawn roughly north and south, called the "Monon Line," and west of another such line, which is not named, is "Destination Territory"; it is the region with which this suit is chiefly concerned; some of the plaintiff carriers are the only roads which reach this territory; some of them have lines direct from the eastern seaboard; some connect with eastern lines; some are such connecting eastern lines. The territory to the south of "Official Territory" is "Southern Territory"; some of the plaintiff carriers connect with southern lines which feed this territory. The existing joint rates from "Southern Territory" to "Destination Territory" when some of the plaintiff carriers filed new rates on May 5, 1935, are the "present rates"; the new rates are the "suspended rates"; they did not differ substantially from the "present rates," and it will be more convenient to ignore the "present rates" altogether. Certain southern refiners protested against the newly filed rates, and the Commission suspended them and ordered an investigation as to their lawfulness. Two New Orleans shippers then filed a complaint that the rates from New Orleans to "Destination Territory" were unreasonable and prejudicial; New York shippers filed a complaint alleging that similar rates from Brooklyn, N. Y., and Edgewater, N. J., to certain

points in Virginia, the Carolinas, Kentucky and Tennessee were also unreasonable and prejudicial; and a Savannah shipper filed a complaint that similar rates from Savannah to "Destination Territory" were unreasonable and prejudicial. The Commission, after an investigation upon all three complaints, on March 8th, 1937, by a divided vote cancelled the "suspended rates" as unreasonable, and prescribed lower rates for the future. The plaintiff carriers then began this suit to set aside the three orders and the defendant answered. Numerous interested parties have intervened, and the case comes up for final hearing upon the pleadings and the evidence which consists of the Commission's report, the minutes of the testimony and evidence taken before it, and the orders. The following statement is from the findings of the report. "Destination Territory" is supplied with sugar from eastern refineries on the seaboard at New York, Philadelphia, Baltimore and the like, and by southern refineries in Louisiana and Georgia. "Official Territory" west of the "Monon Line" is supplied by all-rail, by barge-rail, and by barge-truck transportation, and the all-rail rates are controlled by the other two; the result being that rates from "Southern Territory" to "Official Territory" west of "Destination Territory" had been reduced below those to "Destination Territory." Because of water competition all-rail rates from the northern seaboard to all parts of "Official Territory" had also been reduced. The northern carriers connecting with the south refused, however, to reduce the joint all-rail rate from "Southern Territory," to "Destination Territory"; and that was the shippers' grievance in the first and third complaints just mentioned. Two of the orders appealed from brought these rates into accord with the all-rail rates from "Southern Territory" to "Official Territory" west of the "Monon Line," and with all-rail rates within "Official Territory," and corrected these grievances.

Before 1931 sugar had moved in substantial volume by all rail routes from the "Southern Territory" to "Destination Territory," but since then the movement has been almost entirely by barge-truck or barge-rail. All-rail carriage had ceased because of the reduction at that time of the all-rail rates from the eastern seaboard to meet water competition, and of the water competition itself by the Lakes, or by the Mississippi and Ohio Rivers. Nevertheless, the "suspended rates" were not un-

reasonably high, judged by "operating conditions, value of the commodity, average loading, volume of movement and susceptibility to damage in transit"; indeed, so judged, a somewhat higher level of rates might be lawful in "Official Territory." But, though reasonable when so viewed, these rates had prevented any all-rail movement of sugar from the south since 1932, in spite of a great increase in the barge-rail and barge-truck movement by way of the Mississippi and Ohio during the same period; incidentally, it was impossible to learn how the sugar moving by barge-truck had been divided between "Destination Territory," and "Official Territory" west of the "Monon Line." The "suspended rates" were no greater per mile than those over like distances for a number of other commodities, comparable with sugar in loading, value, volume of movement, and susceptibility to damage in transit; but the rates on these commodities had not been influenced by competition, which had chiefly determined the level of sugar rates.

The Commission found that higher inter-territorial rates were not justified between "Southern" and "Official Territory" than the corresponding intra-territorial rates within these territories, or than the inter-territorial rates on sugar from "Southern Territory" to different parts of "Official Territory." (The effect of this was that the joint all-rail rate from "Southern Territory" to "Destination Territory" must not be higher than from "Southern Territory" to "Official Territory" west of "Destination Territory," or than rates within the "Official Territory" or "Southern Territory.") It found that prevailing rates within those territories formed a reliable test for the rates in question, although the level of practically all rates on sugar had been "determined mainly by carrier competition." It concluded that section 15a(2) of the Interstate Commerce Act, as amended, 49 U.S.C.A. § 15a(2), required it in prescribing reasonable rates, to consider among other factors, the effect of the rates upon the movement of all traffic, and the need of efficient railway transportation; and that as the "suspended rates" would not move the sugar by rail from the south to "Official Territory" including of course "Destination Territory," the proposed rates were necessary if this traffic was to move by rail. It therefore finally concluded that the "suspended rates" were "unreasonable" to the extent that they exceeded the all-rail rates from the south to points west of the

"Monon Line," and from the east to other points in "Official Territory." In addition, it found that any carriers, which participated in the "suspended rates," discriminated against the connecting southern lines on one hand, and in favor of connecting lines from eastern ports on the other, in violation of section 3(3) of the Act, 49 U.S.C.A. § 3(3).

The plaintiffs' argument is that the Commission fixed the new rates only to meet barge-rail and barge-truck competition, having found the "suspended rates" "reasonable," if that factor were eliminated. The defendant denies that the Commission made that factor determinative; it says that we have before us merely the ordinary case of fixing a reasonable rate, and that we need not look beyond the finding to that effect. It is entirely plain, however, that this is not true; the Commission again and again referred to the reduction as necessary to move the traffic, and plainly based its action upon its power to make that the controlling factor. Its use as standards of other sugar rates, "determined mainly by carrier competition," confirms this; such rates are not proper standards unless the movement of traffic should be considered. Interstate Commerce Commission v. Louisville & Nashville R. Co., 227 U.S. 88, 89, 33 S.Ct. 185, 57 L.Ed. 431; Louisville & Nashville R. Co. v. United States, 238 U.S. 1, 13, 35 S.Ct. 696, 59 L.Ed. 1177. Perhaps, the power does in fact exist to make competition control in a proper instance; if it does, it is a corollary of section 15a(2), as amended, which directs the Commission to consider whether rates will move the traffic, and the carriers' need of enough revenue to provide adequate service. In the exercise of that power possibly a rate may be lawfully reduced below what would otherwise be inherently reasonable, when the reduction results in a substantial profit which will strengthen the general resources of the carrier and so enable it to render better and cheaper public service. The decision of the carrier to abandon the traffic which it might secure by means of the reduction, would not in this view be conclusive, as it was before 1920. If that power exists, its exercise depends upon a good many other variables than those relevant merely to fixing the usual reasonable rate. A "reasonable" rate in that sense must indeed be first determined; but the inquiry cannot stop there; the Commission must go on to consider how much new traffic the reduction will move, what will be the profit on it, and how it will affect the other traffic upon the carrier's lines. Perhaps it must also consider the effect of the reduction upon the traffic of connecting carriers, for section 15a(2), as amended, may mean to bring into hotch-pot their interests as well as those of the carrier directly affected. We do not suggest the answer to these questions, except to say that if the power exists, such answers there must be, at least to what touches the carrier directly affected. In the case at bar the new movement of sugar induced by the reduced rates may be assumed not to change the consumption of sugar in "Destination Territory"; it might, but probably it would not. If not, whatever moved by all-rail routes from the south would cut off a corresponding movement either by barge-rail or barge-truck from the south, or through the Lakes, or by all-rail from the east. The eastern carriers would not of course suffer by any losses of the water carriers, but so far as the all-rail movement from the east decreased, it would directly cut into their revenues, because their haul from the east is much longer than as connecting carriers. Presumably they would not therefore make up by any joint traffic from the south for what they would lose from the east. Again, assuming that it is proper to look to the effect upon the revenues of other carriers than those whose rates are reduced, the loss of the all-rail eastern carriers and that of the barge-rail and barge-truck carriers would have to be balanced against the gain of both eastern carriers and southern carriers by their new joint all-rail traffic from the south. This serves to indicate the complexity of the problem, once it be conceded that rates may be fixed with an eye, not alone to their reasonableness considered by itself—a sufficiently manifold question in itself—but to the possibility that though reduced below what would otherwise be reasonable, they will still bring additional revenue which will strengthen the carrier concerned, or that carrier and others as well. Hidden within a finding of "reasonableness" were answers to these questions.

We do not think that the bare finding can be made to do so much duty. The purpose of findings in such cases is to enable the courts to discharge their proper function, which is to make sure that the Commission in the discharge of its highly specialized and technical duties, has followed the statute. We have no competence

to review their conclusions upon questions of rate making, so far as they involve matters peculiar to transportation; it is to the last degree desirable that we should not concern ourselves with them, as the Supreme Court has said again and again; and we cannot so confine ourselves, when the findings are equivocal. It is true that a finding in the ordinary case that a rate is reasonable may conceal interpretations of law which it will be hard to detect, but there must be some compromise as to the statement of details. That does not excuse the absence here of some statement as to the other constitutive facts necessary before a "reasonable" rate can be disregarded and a lower one substituted. In this very case for example, we do not, and cannot know whether the Commission supposed that it was free to reduce the rates in the interest of the shippers, or regardless of the effect that the reduction would have upon the revenues of the plaintiffs, or how far they considered the interests of the southern carriers, or the water carriers. Their conclusion may have been in fact justified, but we have no way of knowing it, and either we should have to abdicate our duty to enforce the law as we understand it, or we should have to substitute our own conclusions upon matters which only the Commission is fitted to consider. The Supreme Court has been increasingly insistent upon the necessity of findings upon the pivotal facts. The defendant says that in Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077, the Commission's very jurisdiction to regulate intrastate rates hinged upon a finding that they directly affected interstate rates; and that here no jurisdictional facts are at issue. "Jurisdiction" is a treacherous word; we are not clear that the Commission's jurisdiction is not involved; but in any event in United States v. Baltimore & Ohio R. R., 293 U.S. 454, 464, 55 S.Ct. 268, 272, 79 L. Ed. 587, it was expanded to "quasi-jurisdictional," which was meant to cover all "indispensable" facts; and in United States v. Chicago, Milwaukee, St. Paul & P. R. R. Co., 294 U.S. 499, 504, 55 S.Ct. 462, 464, 79 L.Ed. 1023, the phrase, "basic or quasi-jurisdictional facts" was substituted, as in Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288. What findings are "basic" is a practical matter; those are such which we need to ascertain on what legal theory the Commission has proceeded; they are absent here, and we think that for this reason the two orders are invalid and should be set aside.

The third proceeding before the Commission was that in which the New York refiners asked that the "suspended rates" from New York to "Southern Territory" be set aside; it turns upon substantially the same facts as the complaints of the southern refiners. In this court the eastern refiners join with plaintiffs in asking that the "suspended rates" to "Destination Territory" be restored; but with the defendant in asking that the new rates be established to "Southern Territory." Their excuse for this inconsistent position is that the plaintiffs have no standing to complain of the new rates to the south, because they did not object to them before the Commission, and do so here only to avoid an appearance of inconsistency. It is indeed true that suits under section 47 of title 28, U.S.Code, 28 U.S.C.A. § 47, are primarily pro interesse suo, and the plaintiff is in general subject to the same personal defenses as any other plaintiff suing in equity. But in this case although the hearings before the Commission were formally separate, the complaints were disposed of at the same time and by a single investigation, and a single suit in this court has challenged them all. The plaintiffs having succeeded in setting aside the two orders in which they are directly interested, it would be absurd to allow the other to stand, because they may not have exhausted their remedies in a controversy of precisely the same kind, and are disqualified to represent vicariously the interests of the southern shippers and southern carriers. Obviously we ought not to single out the New York refiners for a privileged position merely because of the plaintiffs' inaction before the Commission. The prime purpose of all such suits, is to prevent inequality and avoid discrimination; this result would actively promote it, and would merely require a new suit by the southern carriers precisely like this, and bound to have the same result. Indeed, it would be the obvious duty of the Commission to anticipate that necessity by setting aside the order sua sponte; we may do that ourselves, and we will.

There remains the question of discrimination under section 3(3), 49 U.S.C. A. § 3(3). The Commission has forbidden any carrier which serves "Destination Territory" to charge a higher rate to a south-

ern connecting carrier than to an eastern, on the theory that this would be to "discriminate in their rates * * * between such connecting lines, or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper." A large part of the movement of eastern sugar to "Destination Territory" is by carriers on their own rails; the order will not affect this, and those carriers may still exact the old rates from any southern connecting lines. But there are some carriers feeding "Destination Territory" which have eastern and southern connections, and they will be obliged to reduce their rates to the south or raise their rates to the east and lose all the business; if they reduce their rates to the south, the carriers which move sugar from the east on their own rails, would have to accord lower rates to such southern lines as they connect with, or they would throw all the southern business to the carriers having connections both south and east. Hence we shall assume that in fact the orders would be effective to accomplish their purpose. However, it appears to us that the plaintiffs are right in saying that section 3 (3) does not apply to such a situation. Both subdivisions one and three have been in the Act from the beginning, though not separately numbered as now. Subdivision 1, as amended, 49 U.S.C.A. § 3(1), generally forbids a carrier to discriminate unduly or unreasonably in any way between one person, "locality, port, port district, gateway, transit point" and another. It does not, and could not, impose a peremptory prohibition in such cases; the discrimination must be "undue or unreasonable"; discriminations are not per se unlawful, their occasion must be examined. That is not true of discriminations under subdivision three, which *is* peremptory, and admits no excuses; carriers must not discriminate in rates between connecting lines. The discrimination here in question was not really between carriers, but between localities. Of course it is literally true that there cannot be a discrimination between localities without an incidental discrimination between connecting carriers where the localities can only be reached by connecting lines; but for that very reason we should avoid any redundancy. There is some confirmation of this in the last clause of subdivision three, because, although the adverb, "unduly," is there introduced, the prohibition appeared to have in mind alternative routes between the same termini.

That is what we think this part of subdivision three covers; no general inquiry is necessary beyond that of the two alternative routes. We do not believe that the problem of comparative rates between two localities can be so simplified. If the foregoing opinion is thought not to comply with Equity Rule 70½, 28 U.S.C.A. following section 723, the plaintiffs may present proposed findings and conclusions along with their proposed decree.