## QUANAH, A. & P. RY. CO. v. UNITED STATES et al.

### No. 98.

District Court, N. D. Texas.

Aug. 10, 1939.

Robert E. Quirk, of Washington, D. C., and Allen & Gambill, of Fort Worth, Tex., for plaintiff.

Fulbright, Crooker & Freeman, of Houston, Tex. (Philip A. Walker, of Washington, D. C., of counsel), for interveners, cottonseed mills.

Elmer B. Collins, Sp. Asst. to Atty. Gen., Thurman Arnold, Asst. Atty. Gen., and Clyde O. Eastus, U. S. Atty., of Dallas, Tex., for the United States.

Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, and Thomas M. Ross, Atty. Interstate Commerce Commission, both of Washington, D. C., for the Interstate Commerce Commission.

Thompson & Barwise, of Fort Worth, Tex. (Fred L. Wallace, of Forth Worth, Tex., of counsel), for interveners, railroad companies.

Before HUTCHESON, Circuit Judge, and BRYANT and DAVIDSON, District Judges.

HUTCHESON, Circuit Judge.

Plaintiff is a common carrier, owning and operating a line of railroad extending from Quanah, westward to Floydada, Texas, a distance of 112 miles. In addition it operates about nine miles of railroad under lease from the St. Louis, San Francisco Railroad Company, and it has interchange connections with the latter at Carney, Texas, with the Fort Worth and Denver City Railroad Company at Quanah and at Acme, and with the Panhandle and Santa Fe Railroad Company at Floydada.

In the summer of 1938, for the purpose of recapturing, if possible, some of the cottonseed traffic which it at one time carried over its rails to the Quanah Mill, the

only oil mill on its line, traffic which is now moving to that mill by truck, it filed its freight tariffs establishing transit arrangements at Quanah. Under this transit, contonseed in carloads could move into Quanah, be there milled and made into products, cottonseed oil, hulls, meal, et cetera, and the products of the cottonseed thus milled could be shipped from Quanah to the final destination of the products at the through transportation railroad rate from the points on plaintiff's line, where the cottonseed originated.

The Texas Cottonseed Crushers Association, Fort Worth and Denver City Railroad Company and others, having complained to the Commission that the rules and regulations in the tariffs constituted violations of the Provisions of the Interstate Commerce Commission Act, 49 U.S.C. A. § 1 et seq., to their prejudice, the Commission instituted an investigation pending a hearing and suspended the operation of the tariffs. That hearing resulted in a report and order of the Commission, disapproving the tariffs and ordering their cancellation. Complaining of the order as null and void, plaintiff, setting out the loss of traffic it had suffered through truck movements of cottonseed and the efforts it had made to recapture for its line some part of that traffic, brings this suit for an injunction, interlocutory and final, against the enforcement of it. Alleging that the transit arrangements it proposes will prove an effective means of retrieving for it the traffic it has lost to trucks and that such reduction in the tariff charges and such service by it as will result from the plan will not cause a reduction in plaintiff's revenues, but will increase them, plaintiff attacks the order as an interference with the reasonable exercise of managerial discretion, unsupported by findings or evidence, that the transit is unjust, unreasonable, or prejudicial or otherwise in violation of the Act.

Appearing here as interveners, the contestants join with the Commission in defending the order against plaintiff's attacks upon it, and in insisting that, validly entered, it should not be enjoined.

We have carefully examined the report and order in the light of the contentions presented for and against it, and of the record on which it is based. We cannot agree with plaintiff's contentions that the order is void because, (1) unsupported by findings, and (2) not based upon any evidence that the proposed transit arrange-

ment is unreasonable or otherwise in violation of the Act, it is therefore an unwarranted interference with the managerial judgment of the plaintiff.

In his brief plaintiff sets out eight numbered points against the order. These points, however, resolve themselves into two. The first is, that the order is void because it contains no specific finding that the tariff is unreasonable or otherwise in violation of the Act, but based on the assumption that plaintiff had the burden of justifying the proposed transit practice, it finds merely that plaintiff has not justified it.

The second point is that the order of the Commission is void, in that it is not based upon evidence that the proposed transit arrangement is either unreasonable in itself or in its consequences, and therefore it was beyond the authority of the Commission as an attempt to interfere with the managerial judgment of plaintiff, and its right to so adjust and arrange its tariffs competitively as to attract business to its lines. We may agree with the plaintiff that the report of the Commission would have been better drawn if instead of the finding "we find that the proposed schedules have not been justified," there had been a positive finding that "the proposed schedules are unjust and unreasonable, and unduly prejudicial in violation of the Act." We are not in any doubt, though, that when read in connection with the positive and definite finding that the schedules must be cancelled, and in the light of the detailed findings in the report, the finding in question must be taken to be a finding that the condemned practice is unreasonable and violative of the Act; nor are we in any, that plaintiff's first point, that the order falls for want of definite findings, must be rejected.

In its report, the Commission goes fully into the situation as it exists in the territory affected generally and specifically by the proposed transit. The physical and economic factors which enter into and affect the proposed arrangement are all fully considered and appraised, and the effect of it is fully analyzed. The report points out that upon a full and adequate hearing the Commission in Cottonseed, Its Products, and Related Articles, 188 I.C.C. 605, had prescribed the respective rates on cottonseed and its products which should obtain in that territory, and had upon full consideration reached the conclusion that transit should not be required. In a care-

ful and detailed way, it points out, too, the injurious results which would follow the institution of this practice, to plaintiffs in the loss of revenues and to the contestants in the general disruption of acceptable working rates and arrangements, with resulting confusion and loss to all concerned. Among the definite findings made are these:

"The uncontroverted testimony of protestants' witnesses is that the proposed transit arrangements, by reducing the aggregate charges via Quanah, will give the mill operator at that point a temporary advantage and will divert the inbound seed and outbound product to movement via Quanah instead of via the protestant mill operators and carriers. This process is referred to as 'scalping.' It will result in dissipation of respondents' revenues. In some instances it will get less than nothing for its services, and it is urged that, if the proposed schedules are approved, the other southwestern carriers, as a matter of self-defense, will have to establish similar transit arrangements at their mills without benefiting respondent or anyone else except the so-called terminal mills like Fort Worth and Kansas City."

"The transit proposed herein would inaugurate split billing on cottonseed and its products, would sanction outright substitution of seed received by truck for that received by rail, makes no allowance for waste or invisible loss in the transit operation, authorizes unrestricted free out-of-line and back hauls, and permits the manufactured commodities to move from the transit point in disproportion to their relation to the inbound commodity. For illustration, only 15 percent of cottonseed oil can ordinarily be produced from a given amount of cottonseed, yet the transit here proposed would permit 100 percent of cottonseed oil to move out against an equivalent amount of inbound cottonseed billing. Such practices tend toward wasteful transportation.

"It is unnecessary to further detail here other reasons why this transit should not be approved. As already explained other industries that now have transit grew up under that system and required it as a part of their development. On the contrary, the cottonseed industry grew up under the present system which does not include transit, and that industry is overwhelmingly against the adoption of this transit. Those interested in the cottonseed industry

say that the proposal would be disastrous to them. The carriers, other than respondent, take a similar attitude.

"The situation here is much similar to that considered by us in Rules for Storing and Sacking Cement, 78 I.C.C. 693. In that case two carriers proposed to initiate the practice of storing and sacking cement in transit at Davenport, Iowa, a transit practice not theretofore granted by any carrier. That transit was opposed, as the transit here is opposed, by other carriers and affected shippers generally on the ground that it was not necessary for the industry and would only lead to establishment of such transit at other points, the ultimate effect of which would be, as here, to undermine the rate structure.

"We find that the proposed schedules have not been justified. An order will be entered requiring their cancellation and discontinuing this proceeding."

██ Under the settled rule that it is not the form but the substance of the findings and order which controls, these findings are ample. Powell v. United States, 300 U.S. 276, 57 S.Ct. 470, 81 L.Ed. 643; Alton Railroad Company v. United States, 287 U.S. 229, 53 S.Ct. 124, 77 L.Ed. 275; United States v. Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181; Manufacturers Ry. Co. v. United States, 246 U.S. 457, 490, 38 S.Ct. 383, 62 L.Ed. 831; Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291.

██ On the second point, we think the plaintiff stands no better. Its great contention before us in oral argument and in its brief is that the proposed transit arrangement, confined as it is to its own line, is, under the evidence, a matter entirely for its own managerial determination and therefore beyond the power of the Commission to regulate or control, as disruptive of existing just tariffs and existing and just relationships.

The authorities it cites in support of this view do not sustain it. Central Railroad Co. of New Jersey v. United States, 257 U.S. 247, 42 S.Ct. 80, 66 L.Ed. 217, cited as authority for the proposition that since the transit privilege was limited to and effective only on its own line, the Commission was without power to order its discontinued, does not so hold. It merely decides that an order of the Commission that other railroads, because they shared in a joint rate, must give transit privileges at

other points, was not a just or permitted solution of the problem raised by the giving of the privilege at the point in question. That transit privileges are subject to abuse, that their granting is, just as other traffic regulations and practices are, under the jurisdiction of the Commission, and that it has authority to examine, and in a proper case prohibit them, is fully recognized and explicitly declared. Citing some of the same Commission reports on which the Commission relied in its report in this case, the Supreme Court said of the granting of transit privileges: "It rests upon a fiction. The practice is sometimes beneficial in its results, but it is open to grave abuse. To police it adequately is difficult and expensive. Railroad managers differ widely as to the policy of granting such privileges. The Commission clearly has power under Section 1 of the Act to regulate Commerce, 49 U.S.C.A. § 1, to determine whether in a particular case a transit privilege should be granted or should be withdrawn. For that section requires among other things, that carriers establish in connection with direct rates and joint rates, reasonable rules and regulations."

But, says the plaintiff, that decision, the Commission Reports cited in it, and those relied on by the Commission in its report and by the protestants in their briefs were rendered under and rest on the 1920 Act, 41 Stat. 456, that Act was radically amended in 1933, 49 U.S.C.A. §§ 5, 5a, 15a, 15b, 19a, 250 et seq., and the Commission no longer has such power. In support of this view plaintiff cites Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077. An examination of that case will show that the Court did not so hold. The language quoted in plaintiff's brief from the opinion, "had effected a radical change" was a statement by the Court of the appellants' contention, a contention which the Supreme Court flatly rejected. "We are unable," says the Court 292 U.S. at page 8, 54 S.Ct. at page 605, 78 L.Ed. 1077, "to accept that view," that the 1933 Amendment has effected a radical change. "* * * The new Act discloses no intention to weaken national control for essential national purposes over the railway system of the country. It was rather designed to aid that control in the light of the depressed economic condition of the railways. We conclude that the new rule of rate making left the power of the Commission under section 13(4) intact." Cf.

Gasoline from San Francisco Bay Points to Ogden, Utah, 198 I.C.C. 683, 687; Coal from Kansas and Missouri, 198 I.C.C. 535; Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209.

Nor does the third case upon which plaintiff relies, United States v. Chicago, Milwaukee and St. Paul Railroad Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023, any better support its contention that the order complained of here was unauthorized. The order dealt with in that case had to do, not with transit arrangements, but with a lower rate a particular carrier had put in. The holding of the case was merely that, upon the record before it, the Commission was not justified in cancelling the rate. The case did not hold, as plaintiff contends, that the question whether a rate or practice having the effect of reducing charges is unreasonable is governed solely by considerations going to the compensatory character of the return, considered from the standpoint of the particular carrier. It held that the Commission had not found that the returns had been so reduced as to be less than compensatory, and it held that, in view of the fact that the Commission had not found that the rate structure which would be disrupted was itself just and reasonable, but on the contrary the report showed that this was far from so, in the absence of such a finding the Commission was not justified in cancelling the rate. Cf. Youngstown Sheet & Tube Company v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L.Ed. 1553.

Here, the evidence is all one way. The character of the transit privilege and the results upon existing just and reasonable rates, and just and reasonable practices and relations which its institution will entail are undisputed. Introduced into tariffs on cottonseed and its products which had been arrived at and settled by the Commission after careful consideration and determination, tariffs which are recognized as just and reasonable and of which no complaint is made, the practices for which plaintiff contends would cause a rate war with a disturbance in and disruption of these tariffs with no benefit to plaintiff, and a serious dislocating effect on all other established relations in that territory. Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L.Ed. 1553. The Commission was authorized, indeed, under the evidence we think it was required, to find the proposed transit privi-

leges unreasonable and to order their discontinuance. The injunction, preliminary and final, for which the plaintiff prays, will be denied.