**STATE CORPORATION COMMISSION OF the STATE OF KANSAS,**
Plaintiff,

v.

**The UNITED STATES of America,**
Defendant.

**Civ. A. No. T-3169.**

United States District Court
D. Kansas.

April 1, 1963.

Byron M. Gray, Charles C. McCarter, Gen. Counsel, State Corp. Commission, Topeka, Kan., for plaintiff.

Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Newell A. George, U. S. Atty., Topeka, Kan., for United States.

Robert W. Ginnane, Gen. Counsel, Stanton P. Sender, Atty., Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Roth H. Gatewood, Topeka, Kan., William P. Higgins, Omaha, Neb., Harvey Huston, Chicago, Ill. for defendant railroad companies.

Before Delmas C. HILL, Circuit Judge, Arthur J. STANLEY, Jr., Chief Judge, and George TEMPLAR, District Judge.

TEMPLAR, District Judge.

This action was brought by the Kansas Corporation Commission to enjoin, annul, and set aside an order entered July 31, 1962, by the Interstate Commerce Commission in a proceeding entitled "No. 33239, Kansas Interstate Freight Rates and Charges." Upon petition of thirteen principal railroads operating in Kansas, the Interstate Commerce Commission commenced an investigation under section 13(4) of the Interstate Commerce Act to determine whether or not rates and charges of the common carriers by railroad, or any of them, for the intrastate transportation of certain commodities made or imposed by authority of the State of Kansas had caused or will cause, by reason of the failure of such rates and charges to include increases corresponding to those permitted by the Interstate Commerce Commission in the interstate rates and charges on like traffic in Ex Parte Orders Nos. 206 and 212, any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce, on the one hand, and interstate or foreign commerce, on the other, or any undue, unreasonable, or unjust discrimination against, or undue burden on, interstate or foreign commerce; and, if so, to determine what rates and charges should be prescribed to remove any unlawfulness found to exist.

After a hearing, the Interstate Commerce Commission made findings which are hereinafter set out:

"1. The conditions incident to the intrastate transportation within Kansas of crushed stone, sand, gravel, road aggregates, chat, and agricultural limestone; clay draintile, clay sewer pipe, and related articles; light-weight building aggregates, including expanded clay or shale cinders; hay; and petroleum and petroleum products are no more favorable than those incident to the interstate transportation of like traffic to, from, and through points in Kansas.

"2. The amounts and percentages by which interstate freight rates and charges on the commodities named in finding 1 between points in Kansas and points in adjoining States were increased, as authorized in Ex Parte Orders Nos. 206 and 212, are just and reasonable.

"3. The present Kansas intrastate freight rates on the commodities named in finding 1, imposed by authority of the State, are abnormally low, and are not contributing their fair share of the revenues required by the respondents to enable them, under honest, economical and efficient management, to provide adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service, thereby accomplishing the purposes of the Interstate Commerce Act, as set forth in the national transportation policy declared by the Congress, to develop and preserve a national transportation system adequate to meet the needs of the commerce of the United States, of the postal service, and of the national defense.

"4. The burden thus cast upon interstate commerce is undue in and to the extent that those intrastate rates and charges are less than they would be on the basis herein approved; and such intrastate rates and charges cause, and for the future will cause, undue, unreasonable, and unjust discrimination against, and an undue burden on, interstate commerce.

"5. The unlawfulness herein found to exist should be removed by

applying to the Kansas intrastate rates and charges, on the commodities described in finding 1, the same respective increases as are maintained by the respondents on like interstate traffic between points in Kansas and points in adjoining States, as authorized in Ex Parte Orders Nos. 206 and 212, provided that increases may not be made in intrastate rates to levels higher than the interstate rates on like traffic to, from, or through points in Kansas, for like or greater short-line distances over the same lines of railroad.

"6. The establishment of increases in rates and charges as provided in finding 5 will not result in unreasonable rates or charges, nor in rates or charges that are unreasonable in relation to interstate rates or charges, and will increase the revenues of the respondents by substantial amounts.

"7. The present intrastate rates on bituminous coal, and on refractories and related articles, are not shown to cause undue or unreasonable, advantage, preference, or prejudice, or undue, unreasonable, or unjust discrimination against, or an undue burden on, interstate or foreign commerce." (315 I.C.C. 223 at p. ——.)

The foregoing findings were implemented by an order of the Interstate Commerce Commission under date of July 31, 1962. Thereafter, after this Court had issued a temporary restraining order staying the effectiveness of the Commission's order, the Commission itself on September 11, 1962 issued a further order postponing indefinitely compliance with its order of July 31, 1962 until the completion of judicial review.

This Court has had previous occasions to consider actions of this character. On these other occasions, it has determined that the scope of judicial review is very limited under the doctrine of administrative finality and that administrative orders of the Interstate Commerce Com-

mission entered by it in the exercise of its powers, when dealing with matters particularly under its jurisdiction are not to be set aside by this court on review unless such orders are found to exceed constitutional limits, are based upon a mistake of law, have been made without the required hearing, are found to be unsupported by the evidence submitted and considered by the Commission in making its determination, or for some other reason may be found to be an abuse of power by the body acting within the scope of its authority. (See State Corpn. Com. of Kansas v. United States, D.C., 184 F.Supp. 691, and cases therein cited.)

Applying these rules to the instant situation, it is readily apparent that we must first determine whether or not the Interstate Commerce Commission has applied an erroneous rule of law in reaching its conclusion that the Kansas Corporation Commission's intrastate rates upon certain commodities are undue, unreasonable, unjust, and an undue burden on interstate commerce.

The particular section under which the Interstate Commerce Commission predicated its action reads as follows:

"Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against, or undue burden on, interstate or foreign commerce (which the Commission may find without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier, or group or groups of carriers wholly within any State), which is hereby forbidden and declared to be unlawful, it shall pre-

scribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, discrimination, or burden; Provided, That upon the filing of any petition authorized by the provisions of paragraph (3) of this section to be filed by the carrier concerned, the Commission shall forthwith institute an investigation as aforesaid into the lawfulness of such rate, fare, charge, classification, regulation, or practice (whether or not theretofore considered by any State agency or authority and without regard to the pendency before any State agency or authority of any proceeding relating thereto) and shall give special expedition to the hearing and decision therein. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding." [49 U.S.C.A. § 13(4)]

■ It is clear to the Court, after examining this section and the entire record, that whether or not the rates imposed by the Kansas Corporation Commission have created an unreasonable or unjust discrimination against interstate commerce is determined primarily by criteria or factors pertaining to the overall profitable operation of the railroad carriers involved in interstate commerce. Also, a factor that may be considered is the likelihood, or unlikelihood, that rail traffic in the various commodities involved may be consigned via truck carriers upon an increase in the intrastate rates. However, in the final analysis, it is system-wide experience that warrants the greatest consideration because, in that way, the purposes of the Interstate Commerce Carrier Act can best be ef-

fectuated. Furthermore, the Interstate Commerce Commission must construe the act to "promote safe, adequate, economical, and efficient service and foster sound economic conditions and transportation * * *." In addition, since section 13(4) above set out provides specifically that the Interstate Commerce Commission may find without a separation of interstate and intrastate property, revenues, and expenses and without considering in totality the operations or results thereof of any carrier, or group of carriers, wholly within any state, further emphasis must be placed on the necessary profitable operation of the interstate carriers. Under such circumstances, it seems unnecessary to discuss previous cases which considered the revenue from various commodities and products separately and which considered the effect that an intrastate rate increase might have upon the railroad's intrastate traffic in that commodity.

Upon an examination of the record, we must conclude that the Interstate Commerce Commission applied the correct rule of law to the problem which was before it for consideration.

■ Plaintiff, however, insists that opinions offered by the railroad's traffic experts do not rise to the dignity of being "informed judgments", and that the testimony of these witnesses was given *ex cathedra* without the benefit of study or investigation of the commodities involved. In passing, note should be taken of the fact that this contention was first sustained by the examiner who later reversed his position and accepted the proffered testimony. In this, the examiner was correct; the provisions of Sec. 13 par. (4) as last amended permits this to be done.

■■ A conclusion of the Interstate Commerce Commission, based upon supporting data, including estimates of experienced railroad traffic men, that the probability of increased revenue was sufficiently great to make increases of rates a reasonable exercise of sound managerial judgment is sufficient to meet the

requirements of the statute. (See United States v. Louisiana, 290 U.S. 70, 80, 54 S.Ct. 28, 78 L.Ed. 181.) The opinions of railroad traffic experts in judging the effect of an increase in intrastate rates is substantial evidence of value. (See State of South Carolina ex rel. South Carolina Public Service Commission v. United States, D.C., 136 F.Supp. 897, affirmed per curiam 351 U.S. 944, 76 S.Ct. 845, 100 L.Ed. 1470.)

Now, it is the contention of the plaintiff that the order of the Interstate Commerce Commission, if not set aside, will nullify the order of the Kansas Corporation Commission relating to intrastate rates applicable to certain commodities which move by rail in Kansas. Plaintiff asks this Court to determine that the Interstate Commerce Commission did not have evidence sufficiently conclusive of the unlawfulness of the intrastate rates to justify that Commission in substituting higher rates for intrastate shipments that was determined to be proper by the Kansas Corporation Commission. In this connection, plaintiff points out that intrastate transportation is primarily the concern of the State, and Federal power exists only when intrastate tariffs are so low that an undue or unreasonable advantage, preference or prejudice is created as between persons or localities in interstate commerce on the one hand and in interstate commerce on the other, "or when those rates cast an undue burden on interstate commerce." Plaintiff contends that before a state rate may be nullified, the justification for the exercise of Federal power must clearly appear and that the proof offered must meet a high standard of certainty. (Cf. Public Service Commission of Utah v. United States (1958), 356 U.S. 421, 78 S.Ct. 796, 2 L.Ed.2d 886.)

The evidence on which the Interstate Commerce Commission based its conclusion that an increase in intrastate rates would not divert traffic from the railroads but would in turn increase the revenue of the railroad without an appreciable increase in expenses is both documentary and direct.

Mr. Herman C. Kroll, Manager of the Statistical Bureau of the Western Traffic Association presented Exhibit #35. This Exhibit shows that Kansas railroads handled 4.60 per cent more ton-miles in 1958 than in 1946 and earned 51.05 per cent more gross freight revenue in 1958 than was earned in 1946. The years 1946 to 1958, inclusive, were years of recurring interstate and intrastate rate increases, and the evidence in this exhibit shows that any traffic diversion which might have resulted from the progressively higher rates was not sufficient to defeat the purpose of the rate increases; that is, the production of greater revenue. The same conclusion is even more apparent in examining page 2 of Exhibit 35 which shows the revenue trends of these same railroads considering only Kansas interstate and intrastate traffic; the ton-mile of Kansas traffic rose 4.03%. Mr. Kroll's comments concerning Exhibit 35 were as follows:

"The exhibit which has been marked for identification as 35 has been prepared for the purpose of demonstrating what the experience of the carriers has been with the Ex Parte increases which have become effective in the post-war period. (R. 336.)

\* \* \* \* \* \*

"The information shown in column 4, I believe, demonstrates that the Ex Parte increases have accomplished exactly what the carriers intended them to do, and that is to produce substantially increased revenues on rather short notice, because with the ton miles in 1958 4.6 per cent higher than they were in 1946, the gross freight revenue is 51.05 per cent greater.

"On page two of this exhibit, I have made a similar comparison, but here I am dealing with the tons, ton miles and revenues of traffic handled to, from, through and within the state of Kansas. Here we find a very similar situation to what was true of the system operations.

"I will not burden the record by reading all the figures, but will merely use 1958 as an example. The tons carried in 1958 were approximately three per cent less than they were in 1946. Nevertheless, the revenue ton-miles were 4.03 per cent greater and the revenue was 56.44 per cent greater. (R. 337)

"Q. (by Mr. Gray) intended to prove that you get any additional revenue even though the particular increases sought here are granted, is that correct?

"A. Well, Mr. Gray, as a statistician, I think that Exhibit 35 leads you almost to the inescapable conclusion that there are going to be some increased revenues, but I don't feel as a statistician I can say with any preciseness * * *" (R. 342)

Supplementing Mr. Kroll's presentation were the exhibits and testimony of experienced traffic officials of five of the major Kansas railroads. Exhibit 19, for example, illustrated the experience of the Atchison, Topeka & Sante Fe Railway system with rate increases and was prepared in the same general form as Exhibit 35 which applied to the Kansas railroads as a group. Mr. Clarence E. Roberts, Assistant General Freight Agent of the Santa Fe, who had 20 years of freight traffic experience, testified as follows:

"While there has been a diversion of a small amount of traffic to other forms of transportation, much of it is a natural diversion which has continued over a long period of years due to ability to secure certain products from nearby sources of supply and while, no doubt, this diversion will continue to some extent, past increases have resulted in an over-all increase in revenue and I am convinced that what we are here seeking will have the same result.

"Exhibit A–19, consisting of two pages, shows the trend of freight traffic tonnage and gross revenue of the A., T. & S. F. Railway Company System for the years 1946 through 1959. The year 1946 is used as Index 100 or the base year as the Ex Parte 162 interim increase which became effective July 1, 1946, was the first general increase following World War II.

"It will be noted from this exhibit that the total tonnage handled in every year since 1946 has been greater than the tonnage handled in 1946, also that the tonnage handled during 1958 represented 112.6 per cent of the tonnage handled in 1946, and that the tonnage in 1958 was considerably greater than that handled in 1957. The exhibit also shows that the revenue has increased percentagewise to a much greater extent than has the tonnage. For example, the 1958 revenue represented 164.6 per cent and 1959 revenue was 175 per cent of the 1946 revenue.

"Exhibit 19 also shows the dates on which the various general ex parte increases became effective and while there have been fluctuations from year to year due to leveling off of business activities and drought conditions, such increases have definitely resulted in increased revenue.

"It will be noted that the second interim Ex Parte 166 increase became effective January 5, 1946, and the final Ex Parte 166 increase became effective August 21, 1948, and while the 1948 tonnage fell off slightly from 114.1 per cent in 1947 to 113.9 per cent of the same 1946 tonnage, the revenue for 1948 increased from 122.5 per cent in 1947 to 139.9 per cent of the 1946 revenue.

"In similar proceedings where Kansas rail carriers have sought general increases on Kansas intrastate traffic to the same extent as authorized on interstate traffic under the various ex parte orders, it had been claimed that such increases would result in diversion of most, if not all, of the movement of various

commodities to other forms of transportation. Our experience has been that such diversions have been relatively small and it is my considered opinion that generally such diversions under the proposed increases will also be small." (R. 52–54)

\* \* \* \* \* \*

"Q. (by Mr. Huston) Based upon the experience of the Santa Fe system with general freight rate increases since 1946, do you have an opinion as to whether or not general increases result in the production of increased revenue?

"A. It does, yes, it is my opinion that it does." (R. 107)

Mr. Roberts, in addition, presented Exhibit 3 showing all Kansas intrastate and interstate carload terminations of the involved commodites based upon a traffic study for the month of September, 1959 (R. 27–29, Exs. 3, 4.)

Mr. William A. Streck, Commerce Agent of the Missouri Pacific, discussed Exhibit 23 which showed that during a period of recurring rate increases that railroad system's gross freight revenues in 1959 were 137 per cent of the 1946 revenues, and concluded by stating:

"This evidence should be convincing that the general increases as authorized during these years have resulted in increased revenue for the Missouri Pacific." (R. 135)

Mr. Frank A. Verchota, Assistant General Freight Agent of the Chicago, Rock Island & Pacific Railroad, who had had 34 years of freight traffic experience, discussed Exhibit 24, plus added data for 1959, indicating that the Rock Island's system tonnage for 1959 was 106.3 per cent of that of 1946, while the freight revenue was 155.3 per cent of the 1946 level. (R. 176–177) A significant extract from this testimony follows:

"Q. Mr. Verchota, do you have an opinion as to whether the rate increases proposed in this case would result in increased freight revenue?

"A. Yes.

"Q. What is that opinion?

"A. It is my opinion that the proposed rate increases will result in increased freight revenue.

"Q. What is the basis for your opinion?

"A. Well, based on my Exhibit 24, the over-all picture shows that we had a substantial gain in our gross revenue earnings." (R. 178)

Mr. William R. Wientge, Commerce Assistant of the St. Louis-San Francisco Railway, discussed Exhibit 25 showing that company's tonnage and freight revenue for each year from 1946 through 1959 (R. 182). Exhibit 25 indicated that the Frisco's system tonnage for 1959 was only 91.5 per cent of that of 1946 while system revenue in 1959 was 150 per cent of that of 1946, demonstrating that a loss in traffic does not necessarily make rate increases self-defeating. Mr. Wientge concluded that:

"My opinion is that my Exhibit 25 indicates that the various ex parte increases have resulted in increased revenue for the Frisco and that the application of increases as sought will result in a further revenue increase."

Mr. W. S. Durfee, Chief of the Commerce Bureau of the Union Pacific Railroad, who had nearly 30 years of freight traffic experience, presented and discussed Exhibit 26, showing the Union Pacific's experience in trends of tonnage and revenues for each year from 1946 through 1959. Pertinent extracts from his testimony follow:

"Q. (by Mr. Higgins) Now, Mr. Durfee, bearing in mind the information shown on Exhibit 26 and the experience of your company with freight revenue after the application of various increases both specific and general, do you have an opinion as to the effect of the increases

384

requested in this proceeding on a number of different commodities upon the revenue of your company?

\* \* \* \* \* \*

"A. I do.

\* \* \* \* \* \*

"Q. (by Mr. Higgins) What would be your opinion as to the effect on the revenue of the Union Pacific if the increases here sought by the railroad respondents were granted?

"A. Over a period of years?

"Q. In your opinion what would the effect be?

"A. We would receive increased revenue." (R. 205–207)

■■ These witnesses, representing the railroad systems operating in Kansas, and familiar with the traffic rates and revenues of the various companies, testified with certainty that while there might be some diversion of traffic, (by reason of the increase in rates) the net result of the increase of rates would be to substantially increase revenues. Plaintiff complains that the evidence offered by these witnesses was based on consideration of the effect of general increases on all commodities in the past and not upon what the result might be in the future as to particular commodities. As stated previously, in this proceeding the Commission is not obliged to consider reasonableness of each individual rate before carrying into effect the necessary increased schedule. The Commission may provide in its order for modification of the general order in specific situations where the general order might not be justly applicable. (See King v. United States, 344 U.S. 254, 275, 73 S.Ct. 259, 97 L.Ed. 301 (1952) This, the Commission by its order, made provision for in this case.

■ The question of the weight of the evidence was for the Commission and not for the Court. The purpose for which the Commission was created was to bring into existence a body which, from its special character, would be best fitted to determine, among other things, whether upon the facts in a given case, there is unjust discrimination against interstate commerce and that purpose extended to the prohibited discrimination produced by intrastate rates. In such a situation, when the Commission exercises its authority after hearing and proper application of rules of law, its findings of fact supported by substantial evidence are not subject to review. The Court may not substitute its judgment for that of the Commission. (See State of Florida v. United States, 292 U.S. 1, 12, 54 S.Ct. 603, 78 L.Ed. 1077.)

We think the Interstate Commerce Commission had before it all of the evidence which was necessary for it to make a proper decision in accordance with the criteria which must be considered in making a decision. Consequently, its judgment must be affirmed.

Counsel for defendants are directed to prepare and submit a journal entry in accordance with the unanimous decision of the Court.

It is so ordered.