**STATE BOARD OF TAX COMMISSIONERS, Appellant (Defendant Below),**

v.

**SOUTH SHORE MARINA, Appellee (Plaintiff Below).**

**No. 3–1180A340.**

Court of Appeals of Indiana,
Third District.

June 30, 1981.

Rehearing Denied August 14, 1981.

Theodore L. Sendak, Atty. Gen., Joel Schiff, Deputy Atty. Gen., Indianapolis, for appellant.

Gerald K. Hrebec, Fred M. Cuppy, and George W. Carberry, Thomas, Burke, Dyerly & Cuppy, Merrillville, for appellee.

STATON, Judge.

The State Board of Tax Commissioners (Board) rendered a final assessment decision for the business property of South Shore Marina (Marina). The assessment included fifty boats located on Marina's property on March 1, 1977. Upon an appeal by Marina from the Board's assessment, the trial court vacated the assessment and ordered the Board to re-assess Marina's property excluding the fifty boats. We reverse the trial court, vacate its judgment, and

reinstate the Board's final assessment. In so doing, we will examine the following:[1]

(1) Whether the assessment was arbitrary or capricious;

(2) Whether there was any substantial evidence to support the assessment; and,

(3) Whether the assessment violated any constitutional, statutory or legal principles.

Under the property tax statutes, Ind. Code §§ 6–1.1–1 to –37 (1976 & Supp.1980), almost all tangible property within the state on March 1 of each year is subject to assessment and taxation for that year. IC 6–1.1–1–2 & –2–1. The following is a brief summary of the administrative organization and appeal process underlying the final assessment of that tax:

"The State Board of Tax Commissioners is responsible for the assessment of property values on both real and personal property. The board is authorized by statute to construe the property tax laws of the state and instruct the various taxing officials in their duties with respect to taxation and assessment [*See* IC 6–1.1–30–14]."

\* \* \* \* \* \*

"*Tax rates.*—Each school corporation and civil taxing unit imposes its own tax rate. [IC 6–1.1–17–5] Property within a given taxing district is often subject to a variety of rates, including those imposed by a county, city, or school corporation. The tax is the product of assessed valuation times the tax rate per $100 of assessed valuation [IC 6–1.1–2–3]. The assessed value is set at one-third of its true cash value [IC 6–1.1–1–3]."

\* \* \* \* \* \*

"Assessments are made in accordance with regulations issued by the board. The initial assessment of real property is made by the township assessor or trustee-assessor [*See* IC 6–1.1–4–1 to –30]. Such assessments are subject to change by a county board of review on its own initiative or on appeal by the property owner. [IC 6–1.1–13–1 to –12]. Either the assessing official or the property owner may appeal the county board's action directly to the State Board of Tax Commissioners [IC 6–1.1–15–3].

"The initial assessment of personal property is made by the property owner [*See* IC 6–1.1–3–1 to –21]. Any subsequent changes made by local assessing officials may be appealed in the same manner as for real property adjustments."

\* \* \* \* \* \*

"All administrative actions of the State Board of Tax Commissioners are final. The board's action, however, can be set aside or subject to redetermination if suit is instituted and a court so orders [IC 6–1.1–15–5]."

Weinstein, Survey of Recent Developments in Indiana, Forward: Indiana Taxation, 13 Ind.L.Rev. 1, 34–36 (1980). Central to the dispute here on appeal is IC 6–1.1–2–4 which lists those taxpayers liable for the property tax:

"(a) The *owner* of any tangible property on the assessment date of a year is liable for the taxes imposed for that year on the property.

---

[1.] Appellant-Board raised the following issues:

"I. Whether the trial court erred in finding that South Shore Marina did not hold, possess, control or occupy the boats in question here in connection with the production of income?

"II. Whether the trial court erred in finding the State Board of Tax Commissioners' assessment to be illegal, capricious and in violation of law?

"III. Whether the trial court erred in finding South Shore Marina's relationship with the boats in question limited solely to the provision for space for storage?

"IV. Whether the trial court erred in finding South Shore Marina not liable for personal property tax in regard to the boats in question here?"

Appellant's Brief, p. 1. As explained, *infra*, issues I and III were not properly in issue before the trial court. We therefore do not address those issues. Issues II and IV are only part of the larger issue of the proper standard of review by a trial court of an administrative agency's final decision. These issues will be addressed.

"(b) A *person holding, possessing, controlling,* or occupying any tangible property on the assessment date of a year is liable for the taxes imposed for that year on the property unless he establishes that the property is being assessed and taxed in the name of the owner. When a person other than the owner pays any property taxes as required by this section, that person may recover the amount paid from the owner unless the parties have agreed to other terms in a contract." (emphasis added)

On March 1, 1977, approximately fifty boats were located on Marina's property. Marina has consistently asserted throughout these proceedings—and still insists upon appeal—that the boats were merely stored upon Marina's property. Marina's position is that it rents space to boat owners who *may* store boats or their equipment upon such space. As evidence of this fact, Marina presented the trial court with a *blank* copy of a "Winter Storage Agreement" allegedly used by Marina regarding all of the boats located on Marina's property. Among the terms of this blank agreement include clear pronouncements that Marina merely rents space and that the boat owners retain possession and control of the boats. In addition to this blank agreement, Peter Zakutansky, president of Marina, testified that Marina did not hold, possess or control the boats on Marina's property. Marina merely rented space to the boat owners.

Though the record is not clear on the specific procedures, apparently the Board assessed the value of the boats on Marina's property as Marina's personal business property; and, Marina protested this assessment. The following facts, however, are clear from the record.

On August 12, 1977, the Board issued a notice to Marina of a scheduled hearing. The notice required Marina to make available to the Board at the hearing on the pertinent books and records regarding the tax assessment. At that hearing, on August 25, 1977, the Board again requested Marina to produce a list of the stored boats. Marina did not produce the list. On December 29, 1977—in response to a letter from Zakutansky—the Board in a letter again requested a list of the stored boats and the names of the owners of the boats. This letter clearly explained that the Board needed this information to insure the boats were assessed to the *owners* of the boats. Marina still did not supply the list. On April 27, 1978, the Board issued a subpoena duces tecum ordering Marina to supply the Board with a list of the boats and their owners at the next scheduled hearing. At that hearing, on May 11, 1978, the Board again requested the list of boats and owners. Still, Marina refused the subpoena and the request. There were other meetings and contacts between the Board and Marina. At no time throughout these entire proceedings did Marina offer a list of the boats assessed, the owners of such boats, or any proof of the actual owners of the boats. On August 31, 1978, the Board assessed the value of the fifty boats to Marina and issued its "Final Assessment Determination."

Thereafter, Marina appealed the Board's assessment to the county superior court. *See* IC 6–1.1–15–1 to –13 (1976 & Supp. 1980). At the trial to the court, Marina introduced three letters—two from Marina to the Board and one from the Board to Marina—and the testimony of Zakutansky. The Board merely cross-examined Zakutansky. This trial evidence makes the position of Marina and Zakutansky perfectly clear. That position can be briefly summarized as follows: Under Zakutansky's interpretation of IC 6–1.1–2–4, Marina did not hold, possess or control the boats on March 1, 1977; under this interpretation Marina was not liable for the property taxes on the boats; and therefore, Marina need not supply any information regarding the boats to the Board. The cross-examination of Zakutansky established that he could get in contact with the boat owners and could, if he so desired, compile a list of the owners of the boats. We also note the blank storage agreement would confirm this fact. Each agreement contains a space for the name of the owner, the address of the owner—including city, state and zip code—and the owner's phone number. The agreement

also includes blanks for information regarding the boat—including make, type, number, length, beam, year, and the name of the boat.

The trial court entered judgment for Marina and vacated the Board's assessment. The trial court made findings of fact and conclusions of law which state, essentially, Marina did not hold, possess, or control the boats on March 1, 1977 and that the assessment of the Board was arbitrary, capricious and contrary to law.

■ We first note the trial court erred in its standard of review. Judicial review of an administrative decision is limited to whether the agency possessed jurisdiction over the subject matter, and whether the agency's decision was made pursuant to proper procedures, was based upon substantial evidence, was not arbitrary or capricious, and was not in violation of any constitutional, statutory or legal principle.[2] *Department of Financial Institutions v. State Bank of Lizton* (1969), 253 Ind. 172, 252 N.E.2d 248; *State ex rel. Public Service Commission v. Boone Circuit Court* (1957), 236 Ind. 202, 138 N.E.2d 4; *Brinson v. Sheriff's Merit Board of Jefferson County* (1979), Ind.App. 395 N.E.2d 267; *Department of Financial Institutions v. Colonial Bank & Trust Co.* (1978), Ind.App., 375 N.E.2d 285, *cert. den.*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75; *Indiana State Board of Tax Commissioners v. Holthouse Realty Corp.* (1976), 170 Ind.App. 232, 352 N.E.2d 535; *Indiana State Board of Tax Commissioners v. Pappas* (1973), 158 Ind. App. 327, 302 N.E.2d 858.

Marina based its appeal from the Board's final assessment to the trial court upon the assumption the Board had erroneously interpreted IC 6–1.1–2–4. It was, however, this assumption of Marina which was erroneous. The action of the Board was, in fact, the imposition of the tax on the fifty boats upon the person apparently owning, holding, possessing or controlling the boats. The Board throughout the entire proceedings prior to its rendering of the final assessment attempted to discover the owners of the boats. That attempt was impeded, frustrated and, to this date, prevented by Marina. The issues which should have been addressed by the trial court were: 1) whether the Board's final assessment was arbitrary or capricious; 2) whether there was substantial evidence to support the assessment; and 3) whether the assessment violated any constitutional, statutory or legal principle.[3] We address those issues here.

## I.

### Arbitrary or Capricious

■ An arbitrary or capricious administrative act is one which is willful and unreasonable, without consideration and in disregard of the facts or circumstances in the case. The act is one without some basis which would lead a reasonable and honest person to the same conclusion. *State Board of Tax Commissioners v. Traylor* (1967), 141 Ind.App. 324, 331, 228 N.E.2d 46, 49–50; *State Board of Tax Commissioners v. Chicago M., St. P. & Pac. R. Co.* (1951), 121 Ind.App. 302, 308–09, 96 N.E.2d 279, 282.

Marina received from the Board one notice, two requests at two separate hearings, one letter and one subpoena duces tecum

---

**2.** The Board is not under the Administrative Adjudication Act. IC 4–22–1–2; *Stokely-Van Camp, Inc. v. State Board of Tax Commissioners* (1979), Ind.App., 394 N.E.2d 209. The above stated standard of review, however, is substantially equivalent to that under the AAA. Judicial review under IC 4–22–1–18 is limited to whether the agency decision is:

"(1) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; or

"(2) Contrary to constitutional right, power, privilege or immunity; or

"(3) In excess of statutory jurisdiction, authority or limitations, or short of statutory right; or

"(4) Without observance of procedure required by law; or

"(5) Unsupported by substantial evidence."

**3.** We briefly note that the Board clearly had jurisdiction over the subject matter. IC 6–1.1–15–1 to –4. It is equally clear from the record the Board used the proper procedures in rendering its final assessment determination.

seeking information to establish the owners of the boats located on Marina's property. Without variation, Marina insisted it was not liable for the property tax, and therefore it need not supply the information. In his December 6, 1977 letter to the Board, Zakutansky first objected to the boats being "inventory," and next objected to the boats being in his "possession or control:"

"This we also disagree with, as we specifically contract with each person renting space on the premises, that South Shore Marina, Inc. is not taking care, custody, or control of their property, and that the property expressly remains in the possession of the owner. We are submitting a copy of our Agreement as an example, the specifics related to the question are underlined."

This letter then continues for seven paragraphs—gratuitously informing the Board: 1) Marina is not liable for nor in custody, control or possession of the boats for insurance purposes; 2) the owners of the boats are the persons liable for the tax and the Board should pursue such individuals through the Conservation Department; 3) the people who break the law will continue to do so; 4) Zakutansky favors a "usage" tax on property—for example boats—and the state should pursue such a tax; and, 5) finally, the letter ends with the following:

"I believe that under the present law we are not required to provide customer lists. Tax collection would not be increased, and the lists would only drive our customers who rent space, to seek space elsewhere in the adjacent states, that do not tax their recreational property at the same level as property used the year around."

Zakutansky's blind insistence upon the correctness of his position made no allowance for the facts from the Board's viewpoint. The Board did not know who in fact owned the boats. It is not, for example, an unreasonable assumption that a boat marina owns boats either for sale or for lease to its customers. In answer to the December 6 letter, the Board expressed its position upon tax assessment to the person "holding, possessing, or controlling" the property on March 1 of each year. The Board's letter then continues:

"We have consistently held that a warehouse or other storage place must submit a listing of the name and address and description of the property held, possessed or controlled to be attached to their annual business personal property tax return annually. If your company would have done this as provided in the regulation, it would have provided the assessing officials with a means to make sure that the property was assessed in the name of the owners of said property. Since you did not do this we have no alternative other than to assess this property to your company."

In the letter, the Board allowed Marina additional time to produce a list of the boat owners. Still, Marina refused.

Zakutansky's purblind position was stated more adamantly in his July 17, 1978 letter to the Board which states in part:

"[R]egarding assessment changes in the March 1, 1977 tax assessment, we are requesting an answer as to the reason, BY LAW, of why an additional . . . assessment was applied to our 1977 taxes after your review."

\*　　\*　　\*　　\*　　\*　　\*

"[W]e do not agree to the non-owned stored boats assessment. South Shore Marina, Inc. does not store boats. We have leased land and subsequently we sublease portions of this space to various individuals, some of whom elected to place *their* personal boat on the sub-let space.

"I question your authority to place such an assessment on South Shore Marina, Inc.

"We are writing this letter, as we do not understand the reasons for the above changes, and would like to receive a detailed explanation as to how and why you arrived at the figure . . . which you added to our assessment."

This same short-sighted insistence upon his "legal" position is further revealed by Zakutansky's trial testimony:

Attorney for the Board:

"Q. Are there any list[s] of the boats, any property there? Do you have any kind of list of the boats that are there?

Zakutansky:

"A. I don't make a list.

"Q. You don't make a list, consolidated list?

"A. No.

"Q. Is there a way to make up a list to know what was on that property?

"A. Yes.

"Q. So, in other words, there would be a customer list if you wanted to make one, is that correct?

"A. Yes.

"Q. Okay. Were you served with a subpoena, I believe it was, May 8, 1978?

"A. Yes.

"Q. Was there any particular reason that you didn't honor that subpoena for a list of boats on that property?

"A. It didn't ask for a list of boats.

"Q. What information did it ask for?

"A. As I understand it, the subpoena asked for property that *I held possession and controlled.* This was the situation—I could not—I kept trying to get an answer to that question and the tax man, after discussing it with him from a logical point of view, *I understand that I cannot, did not hold possessive control.* Property that I did hold possessive control I submitted on my tax form." (emphasis added)

We note at this juncture the subpoena duces tecum specifically required the following information:

"Accounts receivable, storage contracts, customer lists or equivalent records which may reflect data regarding boats and boating equipment held in storage of harbored at the Indiana location as of March 1, 1977."

And the subpoena further stated that the "necessity and relevancy" of such information was:

"To establish value of such property whether owned, held, or possessed as of March 1, 1977."

Zakutansky's testimony continued:

"Q. Now that you understand what the exact number of boats were contained on that property at that time, could you submit a list of those boats at this time?

"A. I understand what he wanted but I felt that as an individual tax payer he's putting an undue burden on me doing the work of the tax people. I don't feel I should be the tax collector and it's—the whole possession and control is such an important question in the operation of my business I felt I had to have an answer.

"Q. So, in other words, the tax statutes, the way the Tax Board's interpret it you don't agree with it so, therefore, you didn't honor the subpoena, is that correct?

"A. No, that's not correct. I honored the subpoena but I did not give him a list because I asked him for a reason, according to all the rulings of the intents that I try to keep getting their interpretations and reasons why and I can't get an answer and the only course they give me is to go to court and cost me money.

"Q. Let me ask you a question without being argumentative.

You did realize that he was asking for a list of the boats contained on that property?

"A. Yes.

"Q. And you didn't comply with that, is that correct?

"A. Well, I felt that was an improper request.

"Q. But you didn't comply with it?

"A. No, I didn't give him a list."

\*    \*    \*    \*    \*    \*

"A. No, I don't hold the boat. I rent them space and they can put whatever they would like on that space.

I don't hold their boats because I don't understand the English language to mean hold something that I can't do something that I want with or to use it. I have property that I hold and I report this on my tax form."

\*    \*    \*    \*    \*    \*

"Q. Just one final question. There is no problem with you compiling a list except the fact that you don't wish to, is that correct?

"A. Well, the question arises that why can't they ask me to go out and make a list of the cars in so and so's parking lot, same thing. They're just as capable of taking inventory as I am as a businessman.

"Q. I realize that. My question was you could compile this whether it's reasonable or not? Whether you think it's reasonable or not you could compile a list of these boats?

"A. Yes.

"Q. Because you have to contact these owners at one time or another. You say these people are the owners and not you and if you had to contact these owners, you could contact these owners, correct?

"A. Yes."

The record before us, as before the trial court, is clear and without contradiction. Marina offered no proof—other than the self-serving statements of Zakutansky—of the actual owners of the boats to the Board. Under Zakutansky's interpretation of the law, Marina owed no tax upon the boats. Upon that sole basis, Marina refused all discovery attempts by the Board. After repeated failures to obtain information regarding the boats, the Board assessed the value of the boats to the apparent owner, holder, possessor or controller of those boats —Marina. Marina now complains such action was arbitrary and capricious.

█ It is a well established principle in this state that a party may not take advantage of those errors in a judicial proceeding which the party commits or invites or which are the natural consequence of the party's neglect or misconduct. *Jolly v. Modisett* (1971), 257 Ind. 426, 275 N.E.2d 780; *State v. Monninger* (1962), 243 Ind. 174, 182 N.E.2d 426; *Moran v. Miller* (1926), 198 Ind.

429, 153 N.E. 890; *Hormuth Drywall & Painting Service, Inc. v. Erectioneers, Inc.*, (1978), Ind.App., 381 N.E.2d 490; *New York Cent. R. Co. v. Cavinder* (1965), 141 Ind. App. 42, 211 N.E.2d 502; *Koeneman v. Aldridge* (1954), 125 Ind.App. 176, 122 N.E.2d 345. Although not previously applied to an administrative proceeding, we find this principle to be particularly applicable to the facts of the present case. Marina complains the Board erred—formulating such alleged error as an arbitrary and capricious action—in assessing the boats to Marina. However, Marina not only invited this alleged error, but the Board's assessment was the natural consequence of Marina's actions.

█ Faced with Marina's refusal to supply the information, the Board was without alternative. It would be frivolous to state the Board could have left the boats unassessed. Such action would clearly violate the constitutional and legislative mandates under which the Board operates. Ind. Const. art. 10, § 1; IC 6–1.1–2–1, –2, –6 § –30–14. It would also be frivolous to argue the boats could have been assessed to one other than Marina. Under IC 6–1.1–2–4, the Board must assess the property to the owner, holder, possessor or controller of the property. Assuming that Marina was not such a person, Marina refused to divulge who in fact owned, held, possessed or controlled the boats. This "alternative" was foreclosed to the Board by Marina.

█ Thus the Board could not reasonably do other than assess the boats to Marina. The assessment was invited by and was the natural consequence of Marina's actions. Marina may not now urge error predicated upon those actions. Marina characterizes the Board's action as arbitrary and capricious. To the contrary, the assessment was the reasonable and considered result with respect to the facts and circumstances confronting the Board.[4]

---

4. This result does not stand for the proposition that a taxpayer must automatically supply the information sought by the Board in notices, requests, letters or subpoenas duces tecum. The taxpayer may contest such discovery attempts upon several legitimate grounds. For example, the taxpayer may challenge the request as a violation of a privileged communication. *See, e. g.,* IC 34–1–14–5, –60–4. Or, the taxpayer may challenge a subpoena as unrea-

## II.

### Substantial Evidence

The second issue which we address is whether there was substantial evidence before the Board to support its final assessment. The standard of review for the substantial evidence test was set out by this Court in *City of Evansville v. Southern Indiana Gas & Electric Co.* (1975) 167 Ind. App. 472, 339 N.E.2d 562. Although that case addressed review of a Public Service Commission decision, the standard of review set out therein is applicable to the present case.

"[T]he 'substantial evidence' test ... is a standard from federal and state common law principles governing judicial review of administrative action. In *Public Serv. Comm'n v. City of Indianapolis* (1956), 235 Ind. 70, 80–81, 131 N.E.2d 308, 312, Justice Arterburn explained the derivation of Indiana's 'substantial evidence' standard of judicial review:

'This rule regarding "substantial evidence" is one adopted by the Supreme Court of the United States in *Florida v. United States* (1934), 292 U.S. 1, 12, 54 Sup.Ct. 603, 608, 78 L.Ed. 1077, where the court said:

" '... its (commission's) findings of fact supported by substantial evidence are not subject to review. It is not the province of the court to substitute their judgment for that of the commission.' "

"Judicial attempts to define the meaning of substantial evidence have met with less than unqualified success. A principal guide to the content of this elusive concept has been a statement by Chief Justice Hughes:

'Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *Consolidated Edison Co. v. NLRB* (1938), 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126.'

"Another statement of the United States Supreme Court provides some additional clarification: Substantial evidence 'means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred....' *NLRB v. Columbian Enameling & Stamping Co.* (1939), 306 U.S. 292, 299, 59 S.Ct. 501, 505, 83 L.Ed. 660. Professor Davis has perhaps provided the best analysis:

'The meaning of "substantial evidence" is about as clear and about as vague as it should be; the main inquiry is whether on the record the agency could reasonably make the finding.... Despite the theory, the judges as a matter of practical fact have a good deal of elbow room to vary the intensity of review as they deem necessary or desirable in particular cases.' 4 K. Davis, Administrative Law Treatise § 29.- 01, at 118 (1958).

"From a review of these authorities, we conclude that the substantial evidence standard authorizes a reviewing court to set aside [agency] findings of fact when a review of the whole record clearly indicates that the agency's decision lacks a reasonably sound basis of evidentiary support. *See Universal Camera Corp. v. NLRB* (1951), 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456."

167 Ind.App. at 484–85, 339 N.E.2d at 572.

■ The Board had before it the testimony and affidavit of one of its officers. That evidence clearly establishes the fifty boats were on Marina property on March 1, 1977. It also establishes the value of the fifty boats. Zakutansky, testifying before the trial court, affirmed the fact that the fifty boats were on Marina property on March 1, 1977. When the record is considered as a whole, there is substantial evidence to support the Board's final assessment.

sonable or oppressive. *Newton v. Yates* (1976), 170 Ind.App. 486, 353 N.E.2d 485. And clearly, where challenged through the administrative and appellate process, the Board must

establish the information sought is "necessary" to a "proper" inquiry. *State ex rel. State Board of Tax Commissioners v. Daviess Circuit Court* (1967), 249 Ind. 580, 230 N.E.2d 761.

## III.

### Violation of Legal Principle

The final issue is whether the Board violated any constitutional, statutory or legal principle. We repeat, however, the issue whether Marina owned, held, possessed or controlled the fifty boats on March 1, 1977 is not properly before this Court. The actual issue which the parties and the trial court should have addressed—and which this Court will address—may be stated as follows: Whether the Board violated any constitutional, statutory or legal principle in assessing the value of the boats to Marina—the apparent owner, holder, possessor or controller of the boats—where Marina prevented the Board from discovering the actual owners, holders, possessors or controllers.

The wellspring of the Board's authority is found in the Indiana Constitution, article 10, § 1, which provides in part:

"The General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to secure a just valuation for taxation of all property, both real and personal...."

Under this provision, the Legislature created the Board. As stated by the Court in *State Board of Tax Commissioners v. McDaniel* (1928), 199 Ind. 708, 716, 160 N.E. 347, 349:

"It will not be doubted that the State Board of Tax Commissioners is a creature of the people through legislative enactment as an administrative agent to aid in gaining for the whole people a uniform and equal rate of assessment and taxation (Art. 10, § 1, Constitution)."

One of the primary functions of the Board mandated by the Legislature is to "see that the property taxes due this state are collected...." IC 6–1.1–30–14. To fulfill that function, the Legislature specifically provided the Board with the following investigatory powers:

"In order to obtain information which is necessary to the board's conduct of a necessary or proper inquiry the state board of tax commissioners, or a board hearing officer or special representative, may:

"(1) Subpoena and examine witnesses;

"(2) Administer oaths; and

"(3) Subpoena and examine books or papers which are in the hands of any person."

IC 6–1.1–30–13. *See generally, State ex rel. State Board of Tax Commissioners v. Daviess Circuit Court, supra.*

By legislative mandate, the Board must promulgate the rules and regulations—including those regarding the duties and procedures of the Board—concerning the assessment of property in this State. IC 6–1.1–31–1. Once adopted, these rules and regulations have the force of law. *Indiana State Board of Tax Commissioners v. Pappas* (1973), 158 Ind.App. 327, 302 N.E.2d 858. Under the Board's regulations for the assessment of tangible personal property—specifically including boats—regulation 50 IAC 4–1–12(c) provides:

"The taxpayer is required to make available to the hearing officer of the State Board sufficient books, records, federal and state income tax returns and related data to determine the assessment of the property in question. If the books, records, tax returns and related data are not made available, a subpoena or a subpoena duces tecum will be issued to obtain this information unless in the judgment of the State Board other action would be more appropriate."

In *Satterwhite v. State* (1895), 142 Ind. 1, 40 N.E. 654, after listing the powers and the duties of the Board under the then current law—substantially equivalent to the present law—the Court stated:

"Finally, as held in *State v. Wood*, 110 Ind. 82, 10 N.E. 639, to aid the board in the discharge of all these duties, it is further provided that they 'may send for persons and papers.'

"As a further aid to the board in the exercise of the powers enumerated above, and particularly in their making the preliminary investigation and inquiry referred to in the information filed with

the court, it was provided in section 6317, R.S. 1881, then also in force, that: 'For the purpose of properly listing and assessing property for taxation, and equalizing and collecting taxes, county auditors, auditor of State and boards of equalization, shall each have the right to inspect and examine the records of all public offices, and the books and papers of all corporations and tax-payers in this State, without charge; and they shall also have power to administer all necessary oaths or affirmations in the discharge of their duties.'

"It is not easy to see how the statute could have more fully conferred upon the board the power to do what it was attempting to do in this case. 'Having these powers,' as said in *State v. Wood, supra,* 'it is clearly the duty of the board to exercise them in proper cases.'

"It is also well said in that case: 'The power to add and assess omitted property, in many cases, would amount to but little, if the board had no power to investigate and determine whether or not property had been so omitted.' And again: 'The power to add and assess omitted property carries with it the power to investigate and determine as to whom the property belongs, and whether or not it has, in fact, been omitted from the tax lists of the owner. And the power to make such investigation includes the power to get information from the supposed owner and other witnesses."

142 Ind. at 6–7, 40 N.E. at 656. In the present case, the Board was clearly exercising its long established authority in seeking the information from Marina.

The Legislature has established that the accuracy of each personal property return shall be examined and verified. IC 6–1.1–3–14. The Legislature provides in IC 6–1.-1–3–15 that:

"In connection with the activities required by section 14[6–1.1–3–14] of this chapter, or if a person owning, holding, possessing, or controlling any personal property fails to file a personal property return with the township assessor as required by this chapter, the township assessor may examine:

"(1) The personal property of the person;

"(2) The books and records of the person; and

"(3) Under oath, the person or any other person whom the assessor believes has knowledge of the amount, identity, or value of the personal property reported or not reported by the person on a return.

"After such an examination, the assessor shall assess the personal property to the person owning, holding, possessing, or controlling that property."

And then clearly and without ambiguity, the Legislature provides:

"*As an alternative to such an examination, the township assessor may estimate the value of the personal property of the taxpayer and assess the person owning, holding, possessing, or controlling the property in an amount based upon the estimate.* Upon receiving a notification of estimated value from the township assessor, the taxpayer may elect to file a personal property return, subject to the penalties imposed by IC 6–1.1–37–7."

IC 6–1.1–3–15 (emphasis added).

And further, under IC 6–1.1–9–6, the Legislature mandates:

"The county assessor shall obtain from the county auditor or the township assessors all returns for tangible property made by the township assessors of the county and all assessment lists, schedules, statements, maps, and other books and papers filed with the county auditor by the township assessors. For purposes of discovering undervalued or omitted property, the county assessor shall carefully examine the county tax duplicates and all other pertinent records and papers of the county auditor, treasurer, recorder, clerk, sheriff and surveyor. The county assessor shall, in the manner prescribed in this article, assess all omitted or undervalued tangible property which is subject to assessment."

And IC 6–1.1–13–3 provides:

"A county board of review shall, on its own motion or on sufficient cause shown by any person, add to the assessment lists

the names of persons, the correct assessed value of undervalued or omitted personal property, and the description and correct assessed value of real property undervalued on or omitted from the lists."

We further take note of the following regulations of the Board which have the force of law. First, 50 IAC 1–1–1 states:

"All taxpayers ... shall be and are required, in addition to giving a full statement of all their personal property, to answer all interrogatories set out in the personal property schedules on proper forms prescribed by the State Board of Tax Commissioners, and furnished by the county assessor.

"Any failure on the part of a taxpayer to give the information requested or show a sufficient reason why the same cannot be given, shall be considered a refusal to give information to the assessing officer, and the assessing officer is authorized to set down and assess to such taxpayer such amount of personal property as he may deem just."

And 50 IAC 4–1–5 provides:

"(A) POSSESSORY INTERESTS—All tangible personal property having a tax situs within the State on March 1 of any year that is held, possessed or controlled by any person other than the owner must be reported by such person on the appropriate return(s).

"(1) LIABILITY—The person who holds, possesses or controls the taxable tangible personal property on the assessment date is liable for the taxes on such property unless such person shall establish that the property is being assessed and taxed in the name of the owner. (Burns 64–403 [IC 6–1–21–3]).

"(2) ASSESSMENT—The assessor will asssess the taxable property in the name of the person holding, possessing or controlling the property unless the assessor has confirmation, either in his own records or from other assessing officials that such property is being assessed in the name of the owner."

And finally, 50 IAC 4–1–10 states:

"The assessor is required by law to make an assessment of personal property if he has sufficient information to indicate there is omitted property. The assessor shall assess the property and notify the taxpayer. As an alternative to such an examination, the township assessor may estimate the value of the personal property of the taxpayer and assess the person owning, holding, possessing, or controlling the property in an amount based upon the estimate. Upon receiving a notification of estimated value from the township assessor, the taxpayer may elect to file a personal property return, subject to penalties."

■ These statutes and regulations, evidence of the Constitution's mandates and the Legislature's authority, grant the Board broad powers. These powers clearly include an extensive authority to discover and assess property to insure all non-exempt property is charged with its fair burden of tax. These statutes and regulations specifically provide for the Board's summary assessment of property where such property is omitted by an individual. We find these statutes broad enough to encompass the summary assessment of property to an individual who: (1) is the apparent owner, holder, possessor or controller of the property; and, (2) refuses to provide the Board with any evidence to the contrary. To hold otherwise would provide the dishonest with the easily implemented subterfuge of merely disclaiming ownership, possession or control of the property and thus avoid the tax liability thereon. The Board cannot be bound by the self-serving statements of taxpayers.

■ As stated by the Court in *Graham v. Russell* (1899), 152 Ind. 186, 191, 52 N.E. 806, 808:

"The tax law intends and has so declared in no uncertain terms that all property liable to taxation shall be charged with that burden and that none shall escape through the fraud or omission of the owner or holder thereof, and it is made the imperative duty, under the law, of every taxpayer to list and return for taxation

all personal property of every description owned and held by him on the 1st day of April of each year legally liable to taxation. The provisions of the law, to which we have referred, granting the powers mentioned to the county auditor and other officials, are intended to afford an instrumentality or agency through which the State, as far as possible, can prevent property subject to taxation from escaping the burdens or charge imposed by the law. *Saint, Treas., v. Welsh, Ex.,* 141 Ind. 382, 40 N.E. 903; *Reynolds, Aud., v. Bowen, Adm.,* 138 Ind. 434, 36 N.E. 756.

"It was held in the latter case that the power to assess property is a summary one, and that in order to secure uniform and just taxation, which the law intends, and to protect the State's revenue against a dishonest evasion of the law, and also to protect the honest taxpayer, it is necessary that tax laws be liberally interpreted in aid of the taxing power. The right of the county auditor and the other officials who in like manner are empowered and charged with the duty to see that omitted property is subjected to taxation, is a continuing one against each and every taxpayer...."

It is the long established law in this state that all presumptions are in favor of the correctness of the proceedings of the auditor and the burden is on the taxpayer to establish that the property in issue was properly omitted. *Prudential Casualty Co.*

*v. State* (1924), 194 Ind. 542, 143 N.E. 631; *Buck v. Miller* (1896), 147 Ind. 586, 47 N.E. 8; *Fell v. West* (1905), 35 Ind.App. 20, 73 N.E. 719. Once property is assessed to an individual, that person has the burden to establish he is not liable for the tax.

That long established law is continued under the present statutes. The Legislature has placed the burden of nonliability on the individual assessed. IC 6–1.1–2–4 provides that the person holding, possessing or controlling the property on the assessment date is liable for the tax imposed "*unless he establishes that the property is being assessed and taxed in the name of the owner.*" (emphasis added).

After an extensive examination of the pertinent constitutional, statutory and legal principles involved, we find no violation in the Board's assessment of the fifty boats to Marina. To the contrary, we find those principles to support the very action taken by the Board under the facts and circumstances of this case.[5] We therefore reverse the trial court, vacate its judgment and reinstate the Board's final assessment determination.

HOFFMAN, P. J., and GARRARD, J., concur.

---

**5.** We further note IC 6–1.1–3–1 provides that as a general rule, personal property is assessed at the place where the owner resides. Subsection (c) of that statute, however, provides:

"(c) Personal property shall be assessed at the place where it is situated on the assessment date of the year for which the assessment is made if the property is:

"(1) Regularly used or permanently located where it is situated...."

And IC 6–1.1–3–9 provides:

"(a) In completing a personal property return for a year, a taxpayer shall make a complete disclosure of all information required by the state board of tax commissioners, that is related to the value, nature, or location of personal property:

"(1) Which he owned on the assessment date of that year; or

"(2) Which he held, possessed, or controlled on the assessment date of that year."

We emphasize again. Due to Marina's refusal to supply the information, the Board had no evidence before it who in fact owned the fifty boats. Our review was limited to whether the Board violated any constitutional, statutory or legal principles in assessing the boats to the apparent owner, holder, possessor or controller of the boats.

Finally, we note the Legislature has provided a remedy mitigating what might otherwise seem a harsh result. IC 6–1.1–2–4 provides:

"When a person other than the owner pays any property taxes as required by this section, that person may recover the amount paid from the owner unless the parties have agreed to other terms in a contract."

Thus, if Marina is in fact not the owner of any of the fifty boats—as so heartily forwarded with argument but without evidence—then Marina may well recover all of the taxes assessed on the boats.