**EMPIRE GAS OF ROCHESTER, INC., Empire Gas Corporation, and Empire Incorporated, Appellants (Plaintiffs Below),**

v.

**STATE of Indiana, and Indiana State Board of Tax Commissioners, Appellees (Defendants Below).**

No. 3–683A178.

Court of Appeals of Indiana, Third District.

Dec. 17, 1985.

owned by Empire and leased, during 1979 and 1980, to Empire's customers. Empire appealed the assessment to the trial court; the parties submitted cross-motions for summary judgment. The trial court granted summary judgment for Empire as to the 1979 assessment, but granted summary judgment for the Board as to the 1980 assessment. The trial court found that the regulation in effect in 1979[1] placed primary tax liability on the possessors of the LP tanks (Empire's customers), but that a regulatory change in 1980[2] transferred primary tax liability to the tanks' owners (Empire). Empire appeals the summary judgment only as to the 1980 assessment.

The issues presented are as follows:

1. Is Empire's assertion that summary judgment was not an appropriate procedure to resolve the dispute waived because of Empire's failure to raise the issue in its Motion to Correct Errors?

2. Are Empire's LP tanks real property and thus not subject to personal property tax assessment?

3. Is Empire primarily liable for the personal property tax assessment of LP tanks leased to its customers?

4. Is Regulation 50 IAC 4.1–6–2, which defines capital and operating leases, unconstitutionally vague?

Affirmed in part and reversed in part.

■ Our standard of review in summary judgment appeals is limited to the determination of whether the trial court correctly applied the law. *Hale v. Peabody Coal Co.* (1976), 168 Ind.App. 336, 343 N.E.2d 316. The only evidence before the trial court consisted of the Stipulation of Fact (including sample lease agreements) and the uncontroverted Affidavit of Randy Coonce, an Empire employee. A summary of that evidence follows.

Empire has fifteen subsidiary companies in Indiana which sell LP gas and lease LP gas storage tanks to customers. The con-

Jerome T. Holderead, Browne, Torrance, Spitzer, Herriman, Browne & Stephenson, Marion, for appellants.

Linley E. Pearson, Atty. Gen., Ted J. Holaday, Deputy Atty. Gen., Indianapolis, for appellees.

STATON, Presiding Judge.

This case concerns an appeal from a personal property tax assessment. The Indiana State Board of Tax Commissioners (the Board) assessed to Empire Gas of Rochester, Inc., Empire Gas Corporation, and Empire Incorporated (Empire) the value of liquid propane (LP) gas storage tanks

1. 50 IAC 4–6–2 (Burns Code Ed.1979).

2. 50 IAC 4.1–6–2 (Burns Code Ed.1980).

tracts Empire uses are designated "Gas Purchase and Equipment Rental (or Lease) Agreement." These contracts state that "this is not a sales contract and title to the leased equipment herein shall never pass...." Stip.Exh. 1, ¶ 8. The tanks, thus, remain at all times Empire's property. As of January 31, 1980, 9,963 LP tanks had been placed with individuals for residential use and not for use in conjunction with a business.

In its 1980 assessment, the Board assessed to Empire the value of all LP tanks owned by Empire, including those leased to its customers. Empire challenged the assessment by filing complaints in twenty Indiana counties; the cases were venued to and consolidated in the Fulton Circuit Court.

## I.

Whether Summary Judgment was Proper

■ Empire argues that summary judgment was not proper, apparently[3] because either genuine issues of material fact exist or because good-faith disagreement is possible as to inferences to be drawn from the facts. As the Board points out, no such allegation of error appeared in Empire's Motion to Correct Errors. In fact, Empire's Motion to Correct Errors states that "the evidence was without conflict." (R. at 222). Empire, in its reply brief, responds to the Board's challenge by stating:

"Empire took exception to and clearly specified in its Motion to Correct Errors those items which Empire believed to be genuine issues of material fact which were raised from the inferences and conclusions arrived at from the agreed facts. Specifically, Empire stated that *the inferences and conclusion reached by the Trial Court were in error* and implicit in that statement was Empire's contention that other inferences and conclusions

could be drawn from those agreed facts and that those specific inferences and conclusions were set forth in Empire's Motion to Correct Errors."

(Reply Brief at 3) (emphasis added). While Empire did not enclose the emphasized language in quotation marks, Empire seems to represent that the language is reproduced from its Motion to Correct Errors. We have searched Empire's Motion to Correct Errors in vain for any such statement, and indeed for any indication that Empire challenged inferences the trial court might have made. The Board's argument that Empire has waived the issue by failing specifically to bring it before the trial court in its Motion to Correct Errors is well taken. *See, e.g., Stanley v. Fisher* (1981), Ind.App., 417 N.E.2d 932, 934. Nevertheless, both parties have fully briefed the substantive issues dispositive of this case. For this reason, and because we prefer to decide an appeal on its merits,[4] we will reach the other issues.

## II.

Real or Personal Property

Empire argues that its LP tanks are real property and are therefore not subject to personal property tax assessment. Empire's argument lacks merit. The Board argues, and we agree, that the determination whether the LP tanks are real property or personal property must begin with the statutory definitions of those terms. IC 6–1.1–1–15 provides:

"6–1.1–1–15. 'Real property' defined. —'Real property' means:

(1) Land located within this state;

(2) A building or fixture situated on land located within this state;

(3) An appurtenance to land located within this state; and

(4) An estate in land located within this state, or an estate, right or privilege

---

**3.** The precise point of Empire's argument on this issue is difficult to discern, primarily because the first several pages of Empire's argument consists of little more than a string of case holdings regarding the standard for granting a summary judgment. To the extent that this

represents an attack on the trial court's grant of summary judgment, we will address it as such.

**4.** *Chuck Callahan Ford, Inc. v. Watson* (1982), Ind.App., 443 N.E.2d 79, 80.

in mines located on or minerals, including but not limited to oil or gas, located in the land, if the estate, right or privilege is distinct from the ownership of the surface of the land. [IC 6–1.1–1–15, as added by Acts 1975, P.L. 47, § 1; 1975, P.L. 48, § 1.]"

The LP tanks obviously are not land, an estate in land, or a building. Therefore, if they qualify as real property they must qualify as either fixtures or appurtenances.

Under the stipulated facts, the LP tanks cannot qualify as either fixtures or appurtenances. First, as to fixtures, the Indiana Supreme Court has explained:

"Generally, under the law of fixtures, the question as to whether any particular thing which has been attached to land has become part of such land or whether such property remains personal property is a mixed question of law and fact and depends on the particular circumstances of each case. Citizens Bank v. Mergenthaler Linotype Co. (1940), 216 Ind. 573, 25 N.E.2d 444; Peed v. Bennett (1944), 114 Ind.App. 412, 52 N.E.2d 629. Also, in order that a certain item of personal property can be said to have become a fixture, the following elements must exist; (1) Annexation of the article to the land; (2) adaptation of the article to the use of the land; and (3) an intention that the article become a permanent part of the freehold." (Citation omitted.)

*State ex. rel. Green v. Gibson Circuit Court* (1965), 246 Ind. 446, 451, 206 N.E.2d 135, 138.

■ We need not consider the elements of "annexation" or "adaption"; the element of "intention" is dispositive.[5] From the undisputed facts it is clear that Empire and its customers never intended that the tanks become a permanent part of the land. The lease agreement, as it pertains to this issue, provides:

"6. That in the event of the termination of this agreement, the Second Party shall immediately surrender possession of the leased property to the First Party. It is further understood and agreed by the parties hereto that as a part of the consideration for this agreement, the First Party, its agents and employees, shall have the immediate right upon any termination of this agreement, to go upon the premises of the Second Party and take possession of said leased property and remove the same from said premises without process of law, and the Second Party hereby waives any trespass or right of action for damages by reason of said entry and removal. Furthermore, that the First Party's license to enter said premises and remove said leased property therefrom, is an irrevocable license and part of the consideration for this agreement."

Stip.Exh. 1, R. at 53 ¶ 6. In light of the clearly expressed intention of the parties, and the stipulated fact that the tanks remain at all times Empire's property, Empire's suggestion that the tanks are fixtures is without merit.

■ The stipulated facts also require a finding that the tanks do not qualify as appurtenances. While Empire makes no cogent argument that its tanks might qualify as appurtenances, the Board, noting a dearth of Indiana caselaw on this point, quotes the Mississippi Supreme Court:

"The appellees acquired title to the entire tract of land and to all buildings and improvements thereon by a single deed. The damaged house was located on the land; it was a part of the land in a legal sense. In the case of Governor of Missouri v. McNair, 1 Mo. 302, 305, it was held that houses and buildings, if belonging to the estate sold, pass by a grant by virtue of the use of the single word 'appertaining.' In City of Milwaukee v. C[hicago] M. & St. P. & P.R. Co., 223 Wis. 73, 269 N.W. 688, 691, it is said ' "Appertain" means to belong to * * * the land upon which it stands so as to be a part of the land in a legal sense.'

---

5. Because the *Green* test joins the elements with the conjunctive "and", lack of any element precludes the finding of a fixture.

Webster's New International Dictionary defines 'appertain' as 'to belong or pertain' and it defines 'pertain' as 'to belong, to have connection with or dependence on some thing, to appertain', and says 'Pertain, appertain are frequently used without distinction in the general sense of belong.' The house here in question clearly 'appertained or belonged to the premises upon which it was located.'..."

*Norfolk Dedham Mut. Fire Ins. Co. v. Hamilton* (1951), Miss., 52 So.2d 495, 496. Using *Norfolk*, the Board reasons that in light of the agreement between Empire and its customers (See Stip.Exh. 1, ¶ 6 *supra*, p. 5), it is clear that the LP tanks do not belong to the land upon which they may be located; instead, the tanks did belong at all times to Empire. Therefore, the Board asserts that the tanks cannot be appurtenances. We find the Board's reasoning persuasive and conclude that, because Empire's LP tanks do not meet the statutory definition of real property, the tanks cannot constitute real property.

■ While the tanks do not meet the statutory definition of real property, they do meet the statutory definition of personal property. IC 6–1.1–1–11, as it applies to this issue, provides:

" 'Personal property' defined.—(a) Subject to the limitations contained in subsections (b) and (c) of this section, 'personal property' means:

 * * * * * *

(6) All other tangible property (other than real property) which is being:

(i) Held for sale in the ordinary course of a trade or business;

(ii) Held, used, or consumed in connection with the production of income; or

(iii) Held as an investment."

Empire has stipulated that it is engaged in the business of selling LP gas and leasing LP tanks to its customers. (R. at 50.) It has further stipulated the obvious fact that

it charges customers for tanks it provides them. (*Id.*) Thus, the tanks meet the definition of personal property contained in IC 6–1.1–1–11(a)(6)(ii); the tanks are tangible property held, used, or consumed in connection with the production of income.[6]

Attempting to avoid the result required by the statutory definitions of real and personal property, Empire relies heavily on regulation 50 IAC 2–1–6. That regulation provides:

"The use of a questionable unit of machinery, equipment or structure will determine its classification as Real or Personal Property. If the unit is directly used for manufacture or a process of manufacture, it is to be considered as Personal Property. If the unit is a land or building improvement, it is to be considered as Real Estate."

Empire's argument on this point fails for two reasons. First, the regulation applies only to a questionable unit of machinery, piece of equipment, or structure. Given the statutory definitions of real and personal property, the character of Empire's LP tanks cannot reasonably be described as questionable. Thus, the regulation does not apply. Second, even if the regulation did apply, it could not modify the statutory definitions of real and personal property; to the extent that the regulation was inconsistent with the statute, the regulation would be ineffective. *Indiana Dept. of State Rev. v. Colpaert Realty Corp.*, (1952), 231 Ind. 463, 480, 109 N.E.2d 415, 422. We conclude that Empire's argument that its LP tanks are real property is without merit.

### III.

### Primary Tax Liability

Empire argues that its customers are primarily liable for any personal property tax owed for the LP tanks. Empire offers several grounds to support its argument.

---

**6.** The conclusion that the tanks are personal property is supported even by Empire's own lease forms, which provide that the customer is to pay the personal property tax on the tanks. Stip.Exh. 1, R. at 53, ¶ 8.

At the time of the Board's assessment, liability for property tax was governed by IC 6–1.1–2–4, which provided:

"(a) The owner of any tangible property on the assessment date of a year is liable for the taxes imposed for that year on the property.

(b) A person holding, possessing, controlling, or occupying any tangible property on the assessment date of a year is liable for the taxes imposed for that year on the property unless:

(1) he establishes that the property is being assessed and taxed in the name of the owner; or

(2) the owner is liable for the taxes under a contract with that person. When a person other than the owner pays any property taxes as required by this section, that person may recover the amount paid from the owner, unless the parties have agreed to other terms in a contract. *As amended by Acts 1981, P.L. 63, SEC. 1.*"

While this statute arguably could be read to make property owners primarily liable for tax assessment, we agree with Empire that it does not clearly indicate any order of priority. We do not agree, however, with Empire's suggestion that the statute may be read to place primary tax liability on persons holding, possessing, controlling, or occupying tangible property (a possessor). First, if a possessor establishes that the property is being assessed and taxed to its owner, the possessor has no tax liability for that property. Second, even if the possessor pays the tax, the statute provides that he may recover the amount paid from the owner unless the parties have agreed to other terms in a contract.[7]

Continuing its argument that its customers have primary tax liability, Empire makes cryptic reference to *State Board of Tax Commissioners v. South Shore Marina* (1981), Ind.App., 422 N.E.2d 723. Empire seems to argue that the Board's posi-tion in the present case is inconsistent with its position in *South Shore*. Empire misreads this Court's holding in that case. In *South Shore*, a marina leased space for boat storage on its property. The Board requested that the marina provide a list of persons storing boats so the Board could assess the property tax to the boats' owners. Despite its receipt of three written notices and a subpoena duces tecum the marina refused to provide the information. *South Shore*, 422 N.E.2d at 726. The Board relied on IC 6–1.1–2–4(b) to assess the value of the boats to the marina. The marina appealed the assessment. This Court upheld the Board's assessment, stating:

"Faced with Marina's refusal to supply the information, the Board was without alternative. It would be frivolous to state the Board could have left the boats unassessed. Such action would clearly violate the constitutional and legislative mandates under which the Board operates." (Citation omitted.)

*South Shore*, 422 N.E.2d at 730.

Empire's use of *South Shore* is not supported by its holding. Clearly, *South Shore* does not establish that assessing possessors of personal property is statutorily preferred over assessing the owners themselves. Only when the Board found it impossible to assess the owners did it assess the possessor. Under the present facts, in contrast, the identity of the owner of the LP tanks has never been in question. *South Shore* lends no support to Empire's position.

While neither IC 6–1.1–2–4 nor *South Shore* supports Empire's argument, regulation 50 IAC 4.1–6–3 must also be addressed. Because of its importance, 50 IAC 4.1–6–3 (§ 3) is set forth in full:

"Sec. 3. Reporting Requirements and Tax Liability. (A) Reporting Leased Property. (1) *Operating leases must be*

---

**7.** Empire points to its own contract and argues that the language in IC 6–1.1–2–4(b) ("unless the parties have agreed to other terms in a contract") requires that its customers be deemed to have primary tax liability. This argument lacks persuasive force. Empire offers no authority to support its suggestion that the agreement between Empire and its customers is binding on a third party such as the State Board of Tax Commissioners.

*reported for assessment and taxation by the owner (lessor) of the personal property,* on Form 103 [50 IAC 4.1-1-6], Schedule A, in the taxing district where the property was situated as of the assessment date.

(a) In addition to the filing requirement stated above, the owner is required to furnish a complete listing, on Form 103-0 [*50 IAC 4.1-1-6*] of all his personal property which was the subject of an operating lease on the assessment date in each taxing district showing the name and address of the person(s) in possession, model, description, location, quantities, date of installation and value per this regulation [*50 IAC 4.1*] reported for assessment and taxation.

(b) The person holding, possessing or controlling (lessee) tangible personal property subject to the conditions of an operating lease shall file and attach with his return in the taxing district where such property was situated a complete listing, on Form 103-N [*50 IAC 4.1-1-6*], of all not owned (leased) personal property. The listing must include the name and address of the owner (lessor), model, description, location, quantities on hand, date of installation and value (if known) per this regulation [*50 IAC 4.1*].

(2) *Capital leases must be reported for assessment and taxation by the person holding, possessing or controlling (lessee) the personal property,* on Form 103, [*50 IAC 4.1-1-6*], Schedule A, in the taxing district where the property was situated as of the assessment date.

(a) In addition to the filing requirement stated above, the lessee is required to furnish a complete listing, of all not owned personal property, on Form 103-N [*50 IAC 4.1-1-6*], in each taxing district where the property was situated. This listing must include the name and address of the owner (lessor), model, description, location, quantities on hand, date of installation and value per this regulation [*50 IAC 4.1*].

(b) The owner of personal property which is termed capital leases above must file a complete listing, showing the name and address of the person(s) in possession, model, description, location, quantities, date of installation and value per this regulation [*50 IAC 4.1*], on Form 103-0 [*50 IAC 4.1-1-6*], in each taxing district where the property was situated as of the assessment date.

(B) *Liability for Taxes. (1) The owner (lessor) of personal property covered by operating leases has the responsibility for reporting such property for assessment and taxation in the taxing district where the property was situated on the assessment date.* This subsection does not relieve the person holding, possessing or controlling personal property covered by operating leases of the responsibility to file a complete listing, on Form 103-N [*50 IAC 4.1-1-6*], of not owned personal property *and the responsibility to pay such taxes if they are not paid by the owner* of the property as provided in Section 5 of Rule 1 [*50 IAC 4.1-1-5*].

(2) *The person holding, possessing or controlling (lessee) personal property covered by capital leases has the responsibility for reporting such property for assessment and taxation in the taxing district where the property was situated on the assessment date.* This subsection does not relieve the owner (lessor) of the responsibility to file a complete listing, on Form 103-0, in the taxing district where the property was situated on the assessment date of all owned personal property which was in the possession of another person *nor does it relieve the owner of the tax liability if not paid by the lessee.*" (Emphasis added.)

According to § 3, personal property covered by an operating lease is assessed to the owner of the property. § 3(B)(1). Only if the owner fails to pay the tax does liability shift to the possessor. *Id.* Personal property covered by a capital lease, however, is assessed to the possessor. § 3(B)(2). Only

if the possessor fails to pay the tax does liability shift to the owner. *Id.*

Empire asserts that the leases in question are capital leases and therefore, primary liability for personal property tax falls on its customers as possessors. Pivotal to this case, then, is the determination whether the leases between Empire and its customers are capital or operating leases.

Capital and operating leases are defined in regulation 50 IAC 4.1–6–2 (§ 2):

"Sec. 2. Types of Leases—Generally, an agreement which conveys the right to use property for a stated period of time are termed leases and are usually classified as either capital leases or operating leases.

(A) *Capital Leases*—includes sales-type leases, direct financing leases and leveraged leases. *These leases must meet one or more of the following conditions to be so classified and are or should be capitalized by the lessee for federal income tax purposes:*

(1) Ownership of the property is transferred to the lessee at or before the end of the lease term.

(2) The lease permits the lessee to purchase the property or renew the lease at a price or rental which is substantially less than the estimated market value or fair rental of the leased property at the time the option to purchase or renew the lease is exercised.

(3) The lease term is equal to 75 percent or more of the estimated economic life of the leased property.

(4) The present value of the minimum lease payments equals or exceeds 90 percent of the fair market value of the leased property at the inception of the lease.

(B) *Operating Leases—includes all other leases.*"

According to § 2, leases are capital leases only if they:

(1) Meet one or more of the criteria established by § 2(A)(1)–(4), *and*

(2) Are or should be capitalized by the lessee for federal income tax purposes.

All other leases are operating leases. § 2(B).

While there is evidence in the record which would support a finding that one or more of the criteria established by § 2(A)(1)–(4) has been met, the requirement that the leases "are or should be capitalized by the lessee for federal income tax purposes" is problematic. "Capitalization" is a technical term with a particular meaning in the law. Capitalization refers to fixing the capital sum which is to be recovered, through depreciation allowance, over the useful life of a depreciable asset. Mertens Law of Federal Income Taxation § 23A.29 (1985). The relationship between capitalization and depreciation was explained by the United States Supreme Court in *Commissioner v. Idaho Power Co.* (1974), 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535:

"Over a period of time a capital asset is consumed and, correspondingly over that period, its theoretical value and utility are thereby reduced. Depreciation is an accounting device which recognizes that the physical consumption of a capital asset is a true cost, since the asset is being depleted. (Footnote omitted.)

\* \* \* \* \* \*

When the asset is used to further the taxpayer's day-to-day business operations, the periods of benefit usually correlate with the production of income. Thus, to the extent that equipment is used in such operations, a current depreciation deduction is an appropriate offset to gross income currently produced."

418 U.S. at 10–11, 94 S.Ct. at 2763.

■ Depreciation deductions are governed by § 167 of the Internal Revenue Code.[8] § 167(a) provides:

"(a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

---

**8.** 26 U.S.C. § 167.

(1) of property used in the trade or business, or

(2) of property held for the production of income."

Thus, to qualify for capitalization and depreciation, a taxpayer is required to use the property for its trade or business, or hold the property for the production of income. In the present case, however, the parties stipulated as follows:

"That of the nine thousand nine hundred sixty-three (9,963) tanks placed with lessees, approximately nine thousand two hundred eighty-two (9,282) or 93% were placed with individuals for residential use and not for use in conjunction with a business."

It is clear from the stipulated facts and the plain language of § 167(a) that at least ninety-three percent of Empire's leases cannot be capital leases. The trial court's decision, insofar as it held that ninety-three percent of Empire's leases were not capital leases, is correct.

While the conclusion is clear with respect to these leases, there remains the question of the other seven percent of the leases between Empire and its customers. As to these leases the stipulated facts and the affidavit of Randy Coonce are devoid of information. This total lack of information precludes any conclusion about the nature of these leases by this Court, and should have precluded any such conclusion by the trial court. There simply is nothing in the evidence which would support a finding that these leases either were or were not capital leases. Therefore, we remand this case to the trial court for determination of the nature of the leases for which there was no evidence. We affirm summary judgment as to those leases which the trial court determines to be operating leases. We reverse summary judgment as to the remaining leases.

## IV.

### Constitutionality of 50 IAC 4.1-6-2

Finally, Empire urges that the Board's regulation defining capital and operating leases, 50 IAC 4.1-6-2 (set forth *supra*, p. 11), is unconstitutionally vague. We disagree.

Empire never states what language in 50 IAC 4.1-6-2 (§ 2) it considers vague. This lack of specificity makes it difficult for us to assess the merit of Empire's argument. The court must also note that Empire's argument is incoherent: Empire states at page fourteen of its brief that "the regulation on its face is clear and straightforward and a taxpayer should have the right to rely on the plain language of a rule...." Then, at page twenty-six of its brief, Empire refers to the identical regulation as follows:

"The regulation regarding capital leases is so vague on its face it prevents a reasonable taxpayer from determining the type of conduct or transaction which will constitute a capital lease."

 However incoherent Empire's argument might be, the force of even a logically consistent argument would be reduced by IC 1-1-4-1(1), which concerns statutory construction. IC 1-1-4-1(1) provides:

"Words and phrases shall be taken in their plain, or ordinary and usual, sense. But technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import."

Empire's argument seems to focus on the word "capitalize." As shown *supra* at p. 1043, "capitalize" is a technical term and has a peculiar and appropriate meaning in law. Generally, the rules applicable to construction of a statute apply to construction of administrative regulations. *Indiana State Dept. of Welfare v. Stagner* (1980), Ind.App., 410 N.E.2d 1348, 1352. Empire offers no construction of the regulation which would require a finding of unconstitutionality. Empire's argument that 50 IAC 4.1-6-2 is unconstitutional is without merit.

We are of the view that whatever lack of clarity exists in this case is attributable to a lack of information regarding the leases

for which there was no evidence. This lack of clarity will be resolved by the trial court.

Affirmed in part and reversed in part.

HOFFMAN, J., concurs.

GARRARD, J., concurs in result.